## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>                              **Plaintiff,**<br>     **v.**<br><br>**TRENDS INVESTMENTS INC., BRANDON ROSSETTI, CLINTON GREYLING, LESLIE GREYLING, ROGER BENDELAC, and THOMAS CAPELLINI**<br>                              **Defendants.** | **Civil Action No. 22-CV-____ (___)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against the defendants Trends Investments Inc. ("Trends"), Brandon Rossetti ("Rossetti"), Clinton Greyling, Leslie Greyling, Roger Bendelac ("Bendelac"), and Thomas Capellini ("Capellini"):

## SUMMARY

1.     This is a securities fraud enforcement action.  Defendants Trends, a company which was in the business of selling stock to investors, and Trends' personnel Brandon Rossetti, Clinton Greyling, and Leslie Greyling, engaged in a scheme to defraud investors in private offerings of shares in publicly traded companies.  The scheme started in early 2017 when Trends offered and sold shares of stock in Alterola Biotech Inc. ("Alterola") to investors.  Alterola was a publicly traded company with no reported revenue that was purportedly developing medicinal chewing gum.  Rossetti and the Greylings misled investors to believe that Trends owned the

shares of Alterola they were offering to sell to investors.  In reality, Trends owned zero shares of Alterola.

2.      Trends planned to obtain enough money from investors to purchase all of Alterola's common stock from a seller of public shell companies—companies that lack meaningful assets or business operations.  However, although Trends obtained money from investors, it did not acquire the Alterola shell at the time, and the scheme evolved over several years as the Greylings and Rossetti scrambled to keep investor funds, obtain a different shell company, solicit further investments, placate investor concerns, and avoid detection.  Among other things, the scheme involved manipulative trading in the securities of one of the companies the Greylings and Rossetti were trying to sell to investors.

3.      Rossetti preyed on investors, some of whom are senior citizens, representing himself as their "broker" or "wealth manager," while he and the Greylings misled them with a series of misrepresentations in connection with their investments in Alterola and a second publicly traded company named Token Communities Ltd. ("Token").  Rossetti was not registered with the Commission as a broker or dealer, nor was he associated with a broker or dealer registered with the Commission.

4.      Bendelac was a director of Trends from August 2017 to October 2019 and participated in the scheme.  Bendelac was a partner of the Greylings in the plan to acquire a shell company using money that was obtained by Trends from investors.  Bendelac, through an entity he controlled, acquired a block of shares in Token which was paid for by Trends using money that Trends received from investors.  During the time period that Trends was offering and selling shares of Token to investors in private offerings, Bendelac worked with Clinton Greyling to coordinate trading in Token stock on the public securities markets.  Bendelac used multiple

brokerage accounts, including Capellini's (Bendelac's brother-in-law), to place trades in Token's stock in order to create the false appearance of active trading in Token's stock and to inflate the stock price.  Bendelac placed these manipulative trades in order to induce the purchase of Token stock (1) by private investors to whom Trends was offering stock; and (2) by other investors in the public marketplace.  In total, Bendelac received approximately $97,000 from the sale of Token stock in the public marketplace.

5.      Capellini provided substantial assistance to the scheme and to Bendelac by giving Bendelac access to his brokerage account and funding the brokerage account, enabling Bendelac to purchase Token stock through Capellini's account while Bendelac was selling Token stock through the brokerage account of an entity controlled by Bendelac.

6.      As a result of the scheme, from 2017 to at least 2020 (the "Relevant Period"), the defendants defrauded more than 30 investors out of approximately $2.3 million.

7.      By engaging in the conduct alleged herein, Trends, Rossetti, Clinton Greyling, and Leslie Greyling violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 340.10b-5].

8.      By engaging in the conduct alleged herein, Rossetti also violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

9.      By engaging in the conduct alleged herein, Bendelac violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 340.10b-5(a) and (c)], and aided and abetted Trends', Clinton Greyling's, Leslie Greyling's, and Rossetti's violations of Sections 17(a)(1) and

(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

10.    By engaging in the conduct alleged herein, Capellini aided and abetted Bendelac's violations of Sections 17(a)(1) and (3) of the Securities Act and Sections 9(a)(2) and 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

11.    The Commission seeks permanent injunctions against the defendants, disgorgement of the defendants' ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)], civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], an order barring the defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

13.    Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.  For example, during the Relevant Period, Trends solicited and received investments from two

Massachusetts investors, and Rossetti resided in Massachusetts at various points when he offered and sold stock on behalf of Trends.

## DEFENDANTS

14.     Trends Investments Inc. ("Trends") is a Delaware corporation with a principal place of business in Florida.  During the Relevant Period, Trends purported to be in the business of selling securities to investors.  Trends was not registered with the Commission as a broker-dealer or in any other capacity.

15.     Clinton Greyling, age 47, is a resident of Florida and the President of Trends.

16.     Leslie Greyling, age 70, is a South African citizen, a resident of the United Kingdom and the father of Clinton Greyling.  Leslie Greyling was deported from the United States after he pled guilty to securities fraud in 1997. *U.S. v. Greyling, et al.*, No. 6:96-CR-00035 (M.D. Fla. 1996).  Although only Clinton Greyling had any formal title with Trends, Leslie Greyling exercised authority over Trends through Clinton Greyling and Rossetti, primarily behind the scenes from the United Kingdom.

17.     Brandon Rossetti, age 41, was a resident of Florida, Maine, and Massachusetts at various points during the Relevant Period.

18.     Roger Bendelac, age 65, is a resident of New York.  Between approximately 1980 and 2006, Bendelac was employed in the securities industry by a series of broker-dealers, including for a period as the Chief Executive Officer of a registered broker-dealer.  Bendelac was a director of Trends from August 2017 to October 2019.

19.     Thomas Capellini, age 59, is a resident of New York.  Between approximately 1994 and 2013, Capellini was employed in the securities industry, including for four years as a Compliance Manager at a registered investment adviser.  On September 30, 2020, Capellini

appeared before officers of the Commission to provide sworn testimony and asserted his Fifth Amendment privilege against self-incrimination in response to all questions regarding Bendelac and Bendelac's use of Capellini's brokerage accounts to conduct coordinated trading in securities including Token.

## RELATED ENTITIES

20.     Alterola Biotech Inc. ("Alterola") is a Nevada corporation with a purported principal place of business in the United Kingdom.  It was incorporated in July 2008 under the name Jedediah Resources Corp.  In July 2010, the company changed its name to Alterola Biotech Inc.  The company's description of its business in periodic reports voluntarily filed with the Commission has evolved from mineral exploration, to medicinal chewing gum, to a drug for ethanol based intoxication, back to medicinal chewing gum, to the cannabis industry generally, and finally to therapeutic cannabinoids.  The company's shares are quoted on OTC Link operated by OTC Markets Group, Inc.  Prior to December 2019, the company traded under the symbol ALTA.  In December 2019, the company changed its trading symbol from ALTA to ABTI.  During the Relevant Period, the stock of Alterola was a "penny stock" as set forth in Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder.

21.     Token Communities Ltd., ("Token") is a Delaware corporation with a purported principal place of business in Florida.  It was incorporated in March 2014 under the name Pacific Media Group Enterprises, Inc., and purported to be in the mobile applications business.  In April 2017, it changed its name to Extract Pharmaceuticals Inc. and purported to enter the medicinal chewing gum business.  In January 2018, it changed its name to Token Communities Ltd. in advance of a reverse merger with a private company, Token Communities PLC, which was completed in May 2018.  Thereafter, the company purported to enter the blockchain technology

sector.  Beginning in September 2016, Token had a class of securities registered with the

Commission under Exchange Act Section 12(g), and its shares were quoted on OTC Link

operated by OTC Markets Group, Inc.  On October 14, 2020, pursuant to Section 12(j) of the

Exchange Act, the Commission revoked Token's securities registration, effective October 15,

2020, after Token failed to file any periodic reports with the Commission since the period ended

June 30, 2018.

**BACKGROUND**

22.      "Restricted stock" is stock of a publicly traded company (also known as an

"issuer") that is acquired from an issuer, or an affiliate of the issuer, in a private transaction that

is not registered with the Commission.  Stock held by an issuer or affiliate of an issuer is

restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock

cannot legally be offered or sold to the public unless a securities registration statement has been

filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement

contains important information about an issuer's business operations, financial condition, results

of operation, risk factors, and management.  It also should disclose any person or group who is

the beneficial owner of more than 5% of the company's securities.

23.      An "affiliate" of an issuer is a person or entity that, directly or indirectly through

one or more intermediaries, controls, is controlled by, or is under common control with, such

issuer (i.e. a control person).  "Control" means the power to direct management and policies of

the company in question.  Typically, affiliates include officers, directors and controlling

shareholders, but any person who is "under common control" with an issuer may also be an

affiliate.  Absent registration, affiliates are only permitted to sell a small percentage of their stock

according to SEC Rule 144 [17 C.F.R. 230.144].

24.     "Unrestricted stock" is stock that may legally be offered and sold in the public marketplace by a non-affiliate, without registration or restriction, ordinarily having previously been subject to a registration statement filed with the Commission.  The term "float" refers to an issuer's purportedly unrestricted stock that is available for trading.  The purportedly unrestricted shares are also sometimes referred to as "free-trading" shares.

25.     A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stocks.  Share certificates for restricted stock typically bear a "restrictive" legend stating that it may not be resold in the public marketplace unless the sale is exempt from the Commission's registration requirements.  Transfer agents commonly remove restrictive legends from stock after receiving a legal opinion letter from an attorney attesting, among other things, that the owner of the stock is not an "affiliate" of the public company.

26.     DTC eligibility means that a public company's securities may be deposited through the Depository Trust Company (DTC), a depository which holds securities and allows for securities to be traded electronically.  Most large U.S. broker-dealers and banks are DTC participants, meaning that they deposit and hold securities at DTC.  DTC eligibility is a prerequisite to book-entry transfer of securities, which facilitates the exchange of shares by broker-dealers in the secondary market.  DTC eligibility enables the deposit of securities in a brokerage account so that they may be sold in the secondary market in bulk.

27.     The Over-The-Counter Securities Market ("OTC Markets") is an inter-dealer quotation and reporting service based in New York through which certain stocks are available for trading and are publicly purchased and sold through brokered orders.

28.     A "shell company" is a legal entity that lacks meaningful assets or business operations.  In a scheme to profit from such companies without actually commencing business operations, individuals sometimes file materially false registration statements and other filings to make company shares appear to be eligible for public trading and quotation.  As a matter of law, acquisition of "free trading" shares by an affiliate means that those free trading shares become restricted shares.  However, when such transactions are designed to allow the buyer to disguise its affiliate status, the buyer may have the opportunity to control both the company and its purportedly "free trading" shares, effectively enabling company insiders to profit by illegally dumping shares they control.  Accordingly, such "clean" shells, as they are called, are often bought or sold for substantial sums by individuals who seek to skirt the registration requirements of the securities laws.

### TRENDS' ALTEROLA INVESTMENT SCHEME

29.     In or around February 2017, the shell company Alterola was for sale for approximately $300,000.  The seller of Alterola offered potential buyers the opportunity to control all or substantially all of the shares of Alterola, including the purportedly "free trading" shares of Alterola that were purportedly held by independent investors.

30.     Leslie Greyling identified Alterola as a company for Trends to acquire, but Trends lacked the funds to purchase the Alterola shell on its own.  To get the money to buy the Alterola shell, the Greylings asked Rossetti to solicit investors to buy shares of Alterola from Trends, knowing that Trends did not own any such shares.

31.     Clinton Greyling created a document to memorialize the scheme and shared that document with Rossetti.  Trends needed to raise $500,000 to purchase Alterola at a cost of $300,000, with Rossetti to receive 40% of the funds raised, $200,000.  Instead of raising money

to buy the Alterola shell transparently, the Greylings and Rossetti schemed to sell shares of Alterola to investors in private transactions by falsely claiming in stock purchase agreements that Trends already owned Alterola shares and could deliver them "simultaneously" with the investors' payments.

32.     Much of the information sent to investors by Rossetti was created or compiled by Leslie Greyling, and both Clinton Greyling and Rossetti regularly provided updates to Leslie Greyling about their dealings with investors and potential investors.

33.     The success of the scheme depended, in part, on maintaining the trust of Trends' existing investors and persuading them that Trends was managing their money profitably. Accordingly, the Greylings and Rossetti acted to create the false appearance that investors' prior securities purchases from Trends were good investments so that investors would be more likely to buy more securities from Trends, or at least not complain to or about Trends.

34.     The securities trading conducted by Roger Bendelac played an important role in this aspect of the scheme.  Bendelac was an experienced professional in the securities industry and used his skills in furtherance of the scheme.  Bendelac utilized a brokerage account at Broker-Dealer A, where he had a personal connection to an employee, to deposit and trade various securities in coordination with Clinton Greyling.  Bendelac's connection at Broker-Dealer A was responsible for supervising Bendelac's account, which was in the name of Aleutian Equity Holdings LLC ("Aleutian"), an entity Bendelac controlled.  As Bendelac described to Clinton Greyling in an email, he had "zero scrutiny" on the deposit of share certificates.  Bendelac also had access to brokerage accounts held by (1) a relative and (2) his brother-in-law, Thomas Capellini, which Bendelac used to place trades.

35.     Some of the investors whom the defendants viewed as prospective purchasers of Alterola stock had made previous purchases from Trends of stock in an issuer named Millennium Energy Corp. ("Millennium").  Millennium stock was not actively trading—there were zero reported market trades in Millennium between December 14, 2016 and February 1, 2017.  On February 3, 2017, the only reported trades for Millennium were orders less than two minutes apart for 100 shares of Millennium at $4.50 per share ($0.50 per share higher than the reported closing price on February 2, 2017, a day with zero trading).  This trade was orchestrated by Bendelac, who placed matching buy and sell orders by logging into Capellini's account and into Bendelac's relative's account from an Internet Protocol address (an identifying number associated with a particular account with an internet service provider) registered to Bendelac:

| Capellini Sell Order | | | Relative's Buy Order | | | Execution | | |
|---|---|---|---|---|---|---|---|---|
| Time | Qty | Price | Time | Qty | Price | Time | Qty | Price |
| 02:17:19 | (100) | $4.50 | 02:19:15 | 100 | $4.50 | 02:20:58 | 100 | $4.50 |

36.     The matching buy and sell orders placed by Bendelac manipulated Millennium's reported stock price and created the false appearance of a bona fide market trade.  Following this trade, there were no trades in Millennium until April 3, 2017.  As a result, the reported market price of Millennium remained at $4.50 per share during that time period.

37.     Trends used the manipulated Millennium price in pitching the Alterola investment to investors.  For example, on February 21, 2017, Rossetti forwarded to an investor to whom he was pitching an Alterola investment a "portfolio report" sent by Leslie Greyling, which summarized that investor's existing investments through Trends.  Those prior investments included 475,000 shares of Millennium, purchased for $0.63 per share and 100,000 shares of Millennium purchased for $0.50 per share.  The February 2017 "portfolio report" valued all of that investor's Millennium shares at $4.50 per share, with a total value of $2,475,000.  Rossetti's

11

email also contained a draft stock purchase agreement for the sale to that investor of 200,000 "FREE TRADING" shares of Alterola, purportedly owned by Trends, for $200,000, with the shares to be transferred "[s]imultaneously with the transfer of the [p]ayment." Although this investor did not buy the Alterola shares as Rossetti proposed, Rossetti asked the Greylings to create a similar "statement" for another previous investor to whom he proposed selling 1.2 million shares of Alterola. Rossetti implored the Greylings to "make this look sexy he will go, he is giving me a final decision after he reads the proposal / statement."

38.     In March and April 2017, Trends obtained approximately $500,000 from seven investors who were promised that they were purchasing shares of Alterola directly from Trends.

39.     Rossetti sent investors content about Alterola created by the Greylings, and added various misrepresentations of his own. For example, on March 6, 2017, Rossetti wrote to one investor that "[m]y company Trends Investments is merging a cannabis company into ALTA [Alterola]. The stock is starting to trade today . . . The Stock is Trading at 3 dollars right now." In reality, Trends did not own or control Alterola and lacked the ability to merge a private company into it, and Alterola's stock was not actively trading. Alterola stock did not trade at all on March 6, had last traded just 100 shares on March 3, had not traded at all since February 24 before that, and had a recent history of similarly negligible and infrequent trading volume (or number of shares traded per day). Rossetti knew at the time that Alterola stock was not trading in any meaningful way: Three days later, on March 9, in an email to Leslie Greyling, he asked, "When will alta [Alterola] start trading?"

40.     In stock purchase agreements sent to investors, Trends falsely represented that it owned at least the number of shares of Alterola stock that each investor was purchasing, that the investors would receive "free trading" shares, and that Trends could deliver those shares

"simultaneously" with the investors' payments.  The stock purchase agreements for several investors also falsely represented that Alterola's common stock was registered with the Commission under Section 12(g) of the Exchange Act and that, since the date of such registration, Alterola had timely filed all required reports with the Commission.  Such registration with the Commission means that a company has undertaken the obligation to make required periodic filings with the Commission which contain important information about its business and audited financial statements.  In reality, Alterola's stock was never registered under Section 12(g); it was therefore not required to file any periodic reports with the Commission, and Alterola had not made a voluntary filing of any quarterly or annual report with the Commission since May 2016 and December 2015, respectively.

## THE SCHEME EXPANDED FROM ALTEROLA TO TOKEN

41.     By the end of March 2017, the opportunity to purchase the Alterola shell had fallen through and the Greylings were searching for a different shell company to buy. Meanwhile, Trends continued to accept new investor funds and retain previously invested funds from Alterola investors and continued to mislead those investors to believe that they would receive Alterola share certificates.

42.     In early April 2017, the Greylings reached an agreement to acquire a different shell company, Pacific Media Group Enterprises, Inc. ("Pacific Media"), which purported to be in the business of developing mobile applications.  The Greylings orchestrated the change of control of Pacific Media by arranging for the transfer of large blocks of stock of Pacific Media from various entities controlled by the seller to various entities controlled by Leslie Greyling, either directly or indirectly through associates, including Trends and Aleutian (Bendelac's entity).  Bendelac did not pay for Aleutian's shares; instead, Trends wired money to the seller's

attorney to pay for Aleutian's shares using funds that Trends had received from investors.  The company changed its name to Extract Pharmaceuticals Inc. ("Extract").  Leslie Greyling installed an associate (whom he controlled) as the CEO of Extract, and Extract purported to change its business, claiming it was developing new technology for delivering pharmaceuticals, including cannabis oil, via chewing gum.

43.     Trends marketed Extract to investors as a cannabis chewing gum business from April 2017 until approximately January 2018.  During that period, Trends received approximately $500,000 from investors who purchased shares of the purported chewing gum business (whether in the name of Alterola or Extract).  In January 2018, Extract changed its name to Token Communities Ltd. and purported to enter the blockchain technology sector.

44.     In or around March 2018, the Greylings finally acquired a large portion of the Alterola shell, including a block of purportedly unrestricted or "free-trading" shares.  Although these share certificates may have appeared to be unrestricted in that they did not bear a restrictive legend, the share certificates were restricted from public sale because the Greylings were affiliates of Alterola.  Despite having promised Alterola investors "free-trading" shares a year earlier, the Greylings did not distribute these shares to investors.

45.     Thereafter, Trends aggressively marketed both Token and Alterola to new and existing investors.  From January 2018 through July 2019, investors paid Trends an additional $1.3 million in return for Trends' promises of shares of Token and/or Alterola.

46.     Rossetti and Clinton Greyling repeatedly misled investors about when they would receive their Token and Alterola share certificates, telling them without basis that they would receive their shares soon or falsely stating that the certificates were currently being processed by the transfer agent or were already in the mail.  For example, from June to August in 2019,

Rossetti sent a series of text messages to one investor promising that the investor's share certificates would be issued, sent, or delivered: "Friday around noon" (June 26); "1st thing in the morning" (July 2); "this week" (July 8); "in the morning" (July 16); "tomorrow around one o'clock" ("July 17); "this week" (July 22); and "this week for sure" (August 1). During this time, Rossetti continued to solicit additional investments from the investor, whose share certificates in Token and Alterola were not issued until mid-September 2019 and January 2020, respectively.

47.     After some investors had received physical share certificates of Token, Rossetti and Clinton Greyling repeatedly misled investors about when Token would be current in its filings with the Commission. This was a critical point for investors, since it would help investors to deposit their shares with a broker-dealer and thereafter sell their shares in public securities markets, since broker-dealers often will not accept the deposit of shares of an issuer that is not current in its filings with the Commission. In stringing the investors along, Rossetti and Clinton Greyling repeatedly directed investors to various broker-dealers, knowing it was unlikely that the broker-dealers would accept deposit of the Token shares under the circumstances.

48.     The scheme involved varied acts of deception and misrepresentations to investors, all designed to keep money coming in, quiet investor concerns, and avoid detection.

49.     For example, Rossetti described himself to investors in emails and text messages as their "broker" or "wealth manager" and referred to the investors as his "clients." Rossetti also described his relationship to investors in ways that suggested he was acting in their best interests. For example, Rossetti texted one investor that it was Rossetti's "moral obligation to bring you these deals . . . ." Rossetti emailed to another investor, "I work for you now. At Trends Investments, we understand the trust and responsibility our clients place in our hands." To

another investor, Rossetti wrote, "I will be managing your account . . . . I will be in the office premarket with my traders . . . . We can always protect your downside with stop loss orders . . . . I look forward to making money with you."  These statements were misleading in that Rossetti did not disclose that he was receiving a 40% cut of their investments or that he was not registered as a broker-dealer, or associated with a registered broker-dealer.

50.     An email introduction for Trends' offer of Token shares, drafted by the Greylings and sent by Rossetti to potential investors, contained the misleading statement that Token had "over 50 institutional shareholders such as AT&T Mobility, Bank of America, G[E] Capital, Comcast to name a few."  This was misleading in that it suggested that these well-known companies had made a decision to become investors in Token.  In reality, these entities had shares of Token because they had been creditors of its predecessor entity when that company went through bankruptcy proceedings.  The Greylings and Rossetti were informed of this in a summary document created by the attorney representing the seller of the shell company, Pacific Media.  As the summary document explained, these well-known companies did not even take possession of their shares as they "failed to respond to transfer agent requests for tax numbers and their stock certificates are being held until they comply."

51.     At various points during the scheme, Rossetti and the Greylings offered investors "free" shares of Alterola as an inducement to invest in Token, or shares of either company as a bonus to quell various investor concerns about the status of their investments.  For example, on April 7, 2018, Rossetti wrote an email to Clinton Greyling, which Clinton Greyling forwarded to Leslie Greyling, listing investors to whom Trends owed shares of either Alterola or Token.  One investor was described as having invested $10,000 and, nearly a year later, still being owed

400,000 shares of Token.  Rossetti noted that "this guy has been a pain in my ass bitching to get him off our back he was compensated" by promising him additional shares.

52.     Rossetti promised one investor that for every share of Token he purchased, he would receive some number of undescribed "Community Coins," which did not exist.

53.     Rossetti often represented to investors that the price at which Trends was offering them shares was a substantial discount to the market price or to some baseless prediction about what a market price would be.  For example, in an email sent to an investor in April 2018, Rossetti stated that Token "is opening on the OTC Markets @ $1.45 per share.  I put aside a block of 2 million shares @ 50 cents."  In reality, there was no active market for shares of Alterola or Token, and Rossetti had no basis for suggesting that an investor could sell their shares for those prices.

54.     Investors who sent money to Trends for shares of Alterola and/or Token ultimately received little, if anything, of value.  Most Alterola investors who belatedly received shares received only restricted shares that they would generally be unable to deposit with a broker-dealer or trade without, at a minimum, obtaining an attorney opinion letter to support the removal of restrictive legends.  Most Token investors who belatedly received shares were unable to deposit their shares with any broker-dealer.  Although Token was briefly current in its filings with the Commission for several months in 2018, its ability to stay current was entirely dependent on the Greylings paying the associated expenses (such as for the preparation and filing of periodic reports).  Token did not timely file its annual report for the period ended June 30, 2018, which was not filed until March 2019, and then stopped making periodic filings with the Commission entirely.  In October 2020, the Commission issued an order revoking the registration of each class of Token's securities pursuant to Exchange Act Section 12(j).

55.     In total from 2017 to at least 2020, the defendants defrauded more than 30 investors out of approximately $2.3 million which was wired to Trends and then further divided among the Greylings and Rossetti.

## TRADING TO FACILITATE THE SCHEME

56.     The scheme also involved sham trading in Alterola and Token stock, which created a false appearance of market activity and price to induce investments, quiet investor concerns, and avoid detection.

57.     Clinton Greyling's primary business, aside from this scheme, had been brokering the purchase and sale of shell companies between shell company buyers and shell company sellers in exchange for a fee.  For several years, Bendelac had regularly assisted Clinton Greyling's shell company brokering business by receiving small blocks of shares of a shell company as arranged by Clinton Greyling, depositing the shares in his brokerage account and then placing a trade, in order to demonstrate to a potential buyer that the issuer's stock could be traded electronically.

58.     On multiple occasions, Clinton Greyling purchased shares from Bendelac in the securities market in a coordinated manner to demonstrate to a prospective buyer of a shell company that the stock was tradeable.  The purchaser would often request that a market trade be made at a certain price, and Clinton Greyling would coordinate a single small trade with Bendelac at the requested price.

59.     To facilitate the Alterola and Token scheme by inducing further investments, Clinton Greyling, Brandon Rossetti, and Bendelac placed orders to buy or sell Alterola and/or Token stock, which created the false appearance of active trading.  Clinton Greyling and Brandon Rossetti traded in both Alterola and Token stock, and all three individuals traded in

Token stock.  These misleading data points were then used by Rossetti to make misrepresentations to private investors to induce them to invest again, or to quiet their concerns. This trading went well beyond the practice described above whereby Clinton Greyling would coordinate with Bendelac to create one small market trade at a desired price for the purpose of demonstrating to a shell buyer that the stock was trading.  The coordinated trades in the Alterola and Token scheme were designed to induce the purchase of securities by others.

60.     Between November 2018 and May 2019, Bendelac placed a series of trades in Token stock in coordination with Clinton Greyling, often after Rossetti asked Clinton Greyling to arrange for a trade to help Rossetti sell Token stock to investors in private transactions on behalf of Trends.  On some occasions, Bendelac sold Token stock in his Aleutian account which Clinton Greyling or Rossetti purchased in open-market trades.  On other occasions, Bendelac sold Token stock in his Aleutian account and also purchased Token stock in Capellini's account or in Bendelac's relative's account in open-market trades.  These manipulative trades are summarized in Exhibit A, attached hereto.

61.     For example, on November 7, 2018, Bendelac's entity, Aleutian, sold 500 shares of Token at $1.60 per share.  Clinton Greyling purchased 100 shares of Token at $1.60 per share, with the stock closing at $1.60 per share, up from $1.01 at open.  The total reported market volume of shares traded that day was 601.

62.     As another example, on February 19, 2019, Clinton Greyling and Bendelac placed coordinated trades in order to create the false appearance of active trading and to manipulate the price of Token:  Bendelac through Aleutian sold 100 shares at $2.05 per share; Greyling bought 100 shares at $2.00 per share and 100 shares at $9.95; and Bendelac bought 100 shares at $2.05 per share in Capellini's account.  However, there was a market transaction between unaffiliated

parties of 3,350 shares of Token at a price of $0.101 per share which dramatically lowered Token's reported price, which closed at $0.101 per share.  Bendelac and Clinton Greyling had multiple phone calls on the evening of February 19, 2019.

63.     The next day, on February 20, 2019, Bendelac sold 200 shares of Token at $2.00 per share in his Aleutian account and purchased 100 shares of Token in his relative's account at $2.25 per share.  The total market volume was 400 shares traded that day, and the price closed at $2.00 per share, up from the prior day's reported closing price of $0.101 per share.

64.     The Greylings and Rossetti monitored the trading activity in Token stock and used this information in connection with the offer and sale of Token stock to investors.  That same day, February 20, 2019, Leslie Greyling sent an email to Clinton Greyling and Rossetti noting that Token's last trade was $2.25 per share (the trade orchestrated by Bendelac described in paragraph 66) and providing a link to a website reflecting the same.

65.     On various dates through April and May 2019, Bendelac sold small amounts of Aleutian's shares of Token, with Greyling, Rossetti, or Bendelac (through Capellini's account or Bendelac's relative's account) buying small amounts.  These trades, which are summarized in Exhibit A, comprised a large portion of the reported market activity.

66.     Starting in June 2019, the volume and frequency of Bendelac's Token trading increased, and some of it involved placing coordinated buy and sell orders using his Aleutian account and Capellini's account.  Bendelac's trades often comprised all or nearly all of the reported total market volume of Token shares traded, creating the false appearance of market activity and artificially inflating the reported prices.  For example:

| | Aleutian Equity and Capellini Trading in TKCM (Selected Days) | | | | |
|---|---|---|---|---|---|
| Date | Aleutian Sale Quantity | Aleutian Sale Proceeds | Capellini Buy Quantity | Capellini Buy Cost | Total Market Volume |
| 6/11/2019 | (400) | $ 1,815 | 500 | $ (2,255) | 500 |
| 6/12/2019 | (1,000) | $ 4,262 | 1,000 | $ (4,262) | 1,000 |
| 6/13/2019 | (1,513) | $ 6,454 | 1,500 | $ (6,400) | 2,013 |
| 6/14/2019 | (2,000) | $ 8,500 | 2,000 | $ (8,500) | 2,000 |
| 6/17/2019 | (1,000) | $ 4,250 | 1,100 | $ (4,675) | 1,200 |
| 6/19/2019 | (2,000) | $ 8,519 | 2,000 | $ (8,519) | 2,000 |
| 9/5/2019 | (8,500) | $ 17,166 | 8,100 | $ (16,318) | 9,175 |
| 9/9/2019 | (2,000) | $ 5,073 | 2,000 | $ (5,068) | 2,400 |
| 10/18/2019 | (2,500) | $ 6,325 | 2,500 | $ (6,325) | 2,500 |

67.     The purpose of the foregoing trading was to induce investment by others in Token shares, including (1) private investors to whom Trends was offering Token stock and (2) others who might purchase stock sold by Bendelac in the public marketplace.  In June 2019, Rossetti was actively soliciting investors to purchase Token stock from Trends.  For example, Rossetti took advantage of the manipulative trading in Token to obtain investments from Investor A.  On June 12, Rossetti described Token shares to Investor A as "selling like hotcakes."  Between June 17 and 24, 2019, Investor A wired $58,000 to Trends for a combined 116,000 shares of Token and some "free" Alterola shares.  Rossetti did not tell Investor A that the market sales of Token shares were orchestrated by the people who controlled Trends and Token.

68.     After receiving these investments from Investor A, Rossetti sought to create and sustain Investor A's belief that these were profitable investments and continued to solicit him for additional investments.  On June 25, 2019 at 10:16:14 AM, Rossetti placed an order to purchase 100 shares (the minimum size of a trade that a broker has to report to the market) at $4.80 per share.  (Aleutian was the principal seller of Token stock in the market that day.)  The stock had closed the previous day at $4.26 per share.  The trade executed within seconds.  One minute later, Rossetti sent a text message to Investor A with a screen shot of information about Token and reflecting a $4.80 per share price and a daily increase of $0.54 per share (12.68%).  Rossetti then sent a text to Investor A stating, "And you're [sic] 86000 shares your profitable big time."

69.     After receiving the above text from Rossetti, Investor A then asked Rossetti, "What is going on with ALTA [Alterola]?  It is at $0.20."  At 10:36 AM, Rossetti purchased 100 shares of Alterola at $0.55 per share.  At 11:10 AM Rossetti responded to Investor A, "Alta [Alterola] is gonna bounce with the news announcements that come out next week.  Last trader [sic] saw is around 50[-]60 cents."

## BENDELAC PROVIDED SUBSTANTIAL ASSISTANCE IN THE FRAUD

70.     Bendelac knew or was reckless in not knowing that his coordinated trading in shares of Token was providing substantial assistance to the fraud scheme.

71.     Bendelac knowingly engaged in the regular practice of helping Clinton Greyling's shell company business by placing small trades before the closing of the transaction at prices requested by the shell purchasers.

72.     Bendelac's securities deposits and trading at Broker-Dealer A would have been deemed suspicious by a broker-dealer conducting a reasonable inquiry into the facts and circumstances surrounding his offer and sale of securities, including Token.  Bendelac's activities using the Aleutian brokerage account frequently presented numerous red flags, including but not limited to a pattern of depositing physical share certificates in thinly-traded low-priced securities (including companies that had undergone a recent name change), selling the shares, and wiring out the proceeds.

73.     Bendelac took advantage of the lack of scrutiny that Broker-Dealer A applied to his deposits of stock and subsequent trading in the Aleutian brokerage account.  As noted above, Bendelac had a personal connection to an employee at Broker-Dealer A who oversaw Bendelac's trading through Broker-Dealer A, and Bendelac knew that this meant there would be little or no meaningful compliance review of his securities deposits or trading activity.

74.     Bendelac expressed in an email to Clinton Greyling that he preferred to receive physical share certificates (sometimes referred to as "certs") to deposit with Broker-Dealer A, rather than to deposit shares in electronic form through the process known as Deposit/Withdrawal at Custodian, or DWAC.  Bendelac noted, "[t]he broker does extra scrutiny on DWAC.  I have zero scrutiny on CERTS."

75.     To deposit shares with a broker-dealer, the owner of the security may be required to provide documentation reflecting how the security owner acquired the shares, and may also be required to submit documentation showing that he or she paid for the shares.  However, Bendelac understood that Broker-Dealer A would not conduct any meaningful compliance scrutiny of his deposits, and suggested to Clinton Greyling that they could document the transfers to Aleutian with phony stock purchase agreements without Bendelac needing to actually pay for the stock.  Bendelac wrote to Clinton Greyling, "I need to make no payments as I need no proof of payments.  Just the Certificate.  You can make the contract with a payable due.  No need to exchange funds for me to put it in."

76.     Bendelac knew that the Token deal was not part of Clinton Greyling's shell company business and that the Greylings had acquired ownership and control of Token. Bendelac partnered with the Greylings to acquire ownership and control of Token (then named Pacific Media), and his entity, Aleutian, received a block of shares paid for by Trends using money obtained from investors.  The purpose of using multiple entities to hold shares was to disguise the common ownership and control so that the "float" of purportedly unrestricted shares would appear to be held by non-affiliates.

77.     Bendelac knew or was reckless in not knowing, at least as of June 2018, that the Greylings were selling Token shares to private investors.  Bendelac was a director of Trends

and he participated in the distribution of shares to some Token investors.  Bendelac signed a

board resolution on behalf of Aleutian resolving that Aleutian would grant shares to seven

Trends investors who had invested in Token or otherwise had been promised shares of Token by

Trends, and provided documents to the transfer agent to facilitate the transactions.

78.     Bendelac prepared for substantial coordinated sham trading and took deceptive

actions to make that possible.  In April 2018, the Greylings and Bendelac arranged for a smaller

share certificate of 300,000 Token shares to be carved out of Aleutian's larger block of

5,400,000 shares.  In September 2018, Bendelac deposited into Aleutian's account at Broker-

Dealer A the share certificate for 300,000 shares of Token.  In doing so, Bendelac submitted to

Broker-Dealer A a letter from an attorney which falsely stated that the shares were "purchased in

a private transaction for a cost basis of 25 cents per share."  Bendelac also submitted an opinion

letter from the same attorney which stated that Aleutian was not an affiliate of Token, which

Bendelac knew to be false.

79.     In April 2019, just prior to the period of time in which Bendelac conducted his

most active trading in Token, Leslie Greyling included Bendelac as a recipient of two emails

which he also sent to Clinton Greyling, Rossetti, and other associates which referenced there

being news about Token on a financial news website and directed the recipients to a website he

described as "FREE REAL TIME QUOTES SHOWS PRICE PRESS RELEASE AND 8K"

concerning Token's stock.

80.     In April 2020, when Bendelac was asked about his trading in an interview with

the Commission staff, Bendelac made statements to the staff which were demonstrably false and,

in some cases, which were contradicted by his own admissions in an interview with law

enforcement agents the next day.  For example, Bendelac told the Commission staff that he did

not have access to Capellini's brokerage account and claimed it was a coincidence that Capellini bought shares of Token from Aleutian in open market trades. The next day, Bendelac admitted to law enforcement agents that Capellini had given Bendelac access to his account. In a similar vein, when Bendelac spoke to the Commission staff, he acknowledged that he had access to his relative's brokerage account, but claimed that his relative placed all of the relative's own orders. When he spoke with law enforcement agents the next day, Bendelac admitted, in sum and substance, that Bendelac conducted the trading in his relative's account.

81.     In total, Bendelac received approximately $97,000 from his sales of Token stock in the Aleutian brokerage account. Approximately $62,000 of these proceeds were from purchases made through Capellini's account, funded by Capellini and at least partially reimbursed by Bendelac, as described below.

### CAPELLINI PROVIDED SUBSTANTIAL ASSISTANCE IN THE FRAUD

82.     Capellini knowingly or recklessly provided substantial assistance to Bendelac's fraudulent securities trading. Capellini initially provided Bendelac with access to Capellini's brokerage account at Broker-Dealer B in 2017 and 2018. Bendelac used Capellini's account to conduct coordinated trades at Clinton Greyling's instruction, including, for example, the trading in Millennium described in paragraph 35.

83.     In 2019, Capellini's involvement expanded beyond providing Bendelac with access to his brokerage account. Capellini undertook additional activity to assist Bendelac in May and June of 2019 to fund Bendelac's trading and to receive reimbursement from Bendelac through an entity Capellini controlled.

84.     On May 21, 2019, Capellini opened up a second brokerage account with Broker-Dealer B, to which he gave Bendelac access.

85.     On June 5, 2019, Capellini funded the new brokerage account with a transfer of $100,000.  Bendelac used these funds to purchase stock through Capellini's accounts, while Bendelac sold the shares through either the Aleutian account or Bendelac's relative's account.

86.     On June 13, 2019, Capellini opened two bank accounts at a bank based in the U.S. in the name of an entity Capellini controlled.

87.     Between June and September 2019, Capellini received in one of his entity's new bank accounts four payments from three Bendelac-controlled entities totaling $36,450 and comprising all of the incoming funds in the bank accounts during this period (excluding two $100 deposits to open the accounts).

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a) of the Securities Act by Trends, Rossetti, Clinton Greyling, and Leslie Greyling)**

88.     Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

89.     During the Relevant Period, the shares of stock of Alterola and Token were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

90.     By reason of the conduct described above, Trends, Rossetti, Clinton Greyling, and Leslie Greyling, directly or indirectly, in connection with the offer or sale of securities of Alterola and Token, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently, (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which

operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

91.     By reason of the conduct described above, Trends, Rossetti, Clinton Greyling, and Leslie Greyling violated, and will continue to violate unless enjoined, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by Trends,**
**Rossetti, Clinton Greyling, and Leslie Greyling)**

92.     Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

93.     During the Relevant Period, the shares of stock of Alterola and Token were securities under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

94.     By reason of the conduct described above, Trends, Rossetti, Clinton Greyling, and Leslie Greyling, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

95.     By reason of the conduct described above, Trends, Rossetti, Clinton Greyling, and Leslie Greyling violated, and will continue to violate unless enjoined, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### THIRD CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Bendelac)**

96.     Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

97.     During the Relevant Period, the shares of stock of Alterola and Token were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

98.     By reason of the conduct described above, Bendelac, directly or indirectly, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

99.     By reason of the conduct described above, Bendelac violated, and will continue to violate unless enjoined, Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

### FOURTH CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder by Bendelac)**

100.     Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

101.    During the Relevant Period, the shares of stock of Alterola and Token were securities under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

102.    By reason of the conduct described above, Bendelac, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

103.    By reason of the conduct described above, Bendelac violated, and will continue to violate unless enjoined, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

## FIFTH CLAIM FOR RELIEF
## MARKET MANIPULATION
### (Violations of Section 9(a)(2) of the Exchange Act by Bendelac)

104.    Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

105.    During the Relevant Period, the shares of stock of Token were securities under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

106.    Section 9(a)(2) of the Exchange Act [15 U.S.C. §78i(a)(2)] makes it unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, to effect a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

107.    By reason of the conduct described above, Bendelac violated, and will continue to violate unless enjoined, Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

### SIXTH CLAIM FOR RELIEF
### UNREGISTERED BROKER
**(Violations of Section 15(a)(1) of the Exchange Act by Rossetti)**

108.    Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

109.    By engaging in the conduct described above, Rossetti. (a) engaged in the business of effecting transactions in securities for the account of others; and (b) directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker or dealer registered with the Commission.

110.    By reason of the conduct described above, Rossetti violated, and will continue to violate unless enjoined, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

### SEVENTH CLAIM FOR RELIEF
### AIDING AND ABETTING
**(Bendelac's Aiding and Abetting Violations of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Trends, Rossetti, Clinton Greyling, and Leslie Greyling)**

111.    Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

112.    During the Relevant Period, the shares of stock of Alterola and Token were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

113.    By reason of the conduct described above, Trends, Rossetti, Clinton Greyling, and Leslie Greyling, directly or indirectly, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, recklessly, or negligently, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

114.    By reason of the conduct described above, Trends, Rossetti, Clinton Greyling, and Leslie Greyling, directly or indirectly, in connection with the purchase or sale of securities of Alterola and Token, by the use of the means or instrumentalities of interstate commerce or of the mails, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

115.    Bendelac knowingly or recklessly provided substantial assistance to Trends, Rossetti, Clinton Greyling, and Leslie Greyling, in their violations of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

116.    By reason of the conduct described above, Bendelac aided and abetted violations of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, as proscribed by Section 15(b) of the Securities Act [15 U.S.C. §§ 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**EIGHTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Capellini's Aiding and Abetting Bendelac's Violations of Sections 17(a)(1) and (3) of the Securities Act and Sections 9(a)(2) and 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder)**

117.    Paragraphs 1 through 87 above are re-alleged and incorporated by reference as if fully set forth herein.

118.    During the Relevant Period, the shares of stock of Alterola and Token were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

119.    By reason of the conduct described above, Bendelac, directly or indirectly, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, recklessly, or negligently, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

120.    By reason of the conduct described above, Bendelac directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected a series of transactions in the securities of Token creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

121.    By reason of the conduct described above, Bendelac, directly or indirectly, in connection with the purchase or sale of securities of Alterola and Token, by the use of the means or instrumentalities of interstate commerce or of the mails, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts,

practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

122.    Capellini knowingly or recklessly provided substantial assistance to Bendelac in his violations of Sections 17(a)(1) and (3) of the Securities Act and Sections 9(a)(2) and 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

123.    By reason of the conduct described above, Capellini aided and abetted violations of Sections 17(a)(1) and (3) of the Securities Act and Sections 9(a)(2) and 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, as proscribed by Section 15(b) of the Securities Act [15 U.S.C. §§ 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.    Enter a permanent injunction restraining each of the defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

B.    Enter a permanent injunction restraining Bendelac and Capellini, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 9(a) of the Exchange Act [15 U.S.C. §78i(a)];

C.    Enter a permanent injunction restraining Rossetti, his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him who

receive actual notice of the injunction by personal service or otherwise, from violating Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

       D.       Order the defendants to disgorge, with prejudgment interest, all ill-gotten gains they obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)];

       E.       Order the defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

       F.       Enter an order prohibiting the defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

       G.       Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

       H.       Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED this 8th day of June 2022.

Respectfully submitted,

/s/ David M. Scheffler
David M. Scheffler (Mass Bar No.670324)
J. Lauchlan Wash (Mass. Bar No. 629092)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8810 (Scheffler direct)
schefflerd@sec.gov (Scheffler email)
