UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>                    Plaintiff,<br><br>     v.<br><br>TRENDS INVESTMENTS INC., BRANDON ROSSETTI, CLINTON GREYLING, LESLIE GREYLING, ROGER BENDELAC, and THOMAS CAPELLINI<br>                    Defendants. | Civil Action No. 22-CV-10889-RGS |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR ENTRY OF DEFAULT JUDGMENT
AS TO DEFENDANT LESLIE GREYLING**

Plaintiff Securities and Exchange Commission (the "Commission") submits this memorandum of law in support of its motion for a default judgment against defendant Leslie Greyling. From early 2017 to at least 2019, Leslie Greyling participated in a scheme with Trends Investments Inc. ("Trends") and others to defraud more than 30 investors out of approximately $2.6 million in private offerings of shares in publicly traded shell companies, Alterola Biotech Inc. ("Alterola") and Token Communities Ltd. ("Token"). Trends was controlled by Clinton Greyling and his father, Leslie Greyling. With the help of an unlicensed broker, Brandon Rossetti ("Rossetti"), who received a 40% cut of the funds he raised from investors, Trends repeatedly lied to and misled investors to sell them stock, quiet their concerns, and avoid detection. Trends' then-director Roger Bendelac ("Bendelac") also participated in the scheme, with the assistance of his brother-in-law, Thomas Capellini ("Capellini"), by conducting coordinated market trades in Token in order to create the false appearance of an active market and to display an artificial stock price. Through these actions, Leslie Greyling violated Section

17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

## **PROCEDURAL HISTORY**

The Commission filed its complaint against defendants Trends, Rossetti, Clinton Greyling, Leslie Greyling, Bendelac and Capellini on June 8, 2022.

Leslie Greyling resides in the United Kingdom. He was validly served by mail at his residential address in the United Kingdom on November 11, 2022 under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. *See* Dkt. No. 81 (Executed Proof of Service). Accordingly, Leslie Greyling's Answer to the Complaint was due by December 2, 2022, which was the date 21 days after he was served with the complaint. *See* Fed. R. Civ. P. 12(a)(1)(i). Leslie Greyling has not filed an answer or a notice of appearance, and no counsel has appeared on Leslie Greyling's behalf or contacted the undersigned on Leslie Greyling's behalf.

On March 10, 2023, the Clerk of the Court entered a default against Leslie Greyling. Dkt No. 103. On March 21, 2023, an email message concerning Leslie Greyling's notice of default with a copy of the notice of default was sent to lesliegreyling@gmail.com, an email address used by Leslie Greyling and no bounce-back message was received. Dkt No. 114 ¶ 6 (Declaration of J. Lauchlan Wash). Further, proof of service was received from delivery service Federal Express that a copy of Leslie Greyling's notice of default was delivered to his residence in Wadhurst, England and that he signed for the delivery but then refused to accept it. *Id*.

## ARGUMENT

**I.     The Commission's Claims against Leslie Greyling Are Established as a Matter of Law.**

   **A.  The Legal Standards for Entry of Default are Satisfied Here.**

The entry of default effects an admission by a defendant of the well-pleaded allegations in the complaint, and those allegations of fact are taken as true. *See Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 13 (1st Cir. 1985), *cert. denied*, 475 U.S. 1018 (1986); *SEC v. Tropikgadget FZE, et al.,* No. 15-cv-10543, 2016 WL 4555595, at *2 (D. Mass. Aug. 31, 2016) ("Because the [] Defendants have been defaulted in this case, they are 'taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability.'"). The court may examine whether the complaint, "taking all well-pleaded factual allegations as true," alleges a cause of action. *Id.* (citing *Ramos-Falcon v. Autoridad de Energia Electrica*, 301 F.3d 1, 2 (1st Cir. 2002)). As detailed below, taking all the well-pleaded facts alleged as true, the Commission is entitled to a default judgment against Leslie Greyling.

   **B.  Leslie Greyling Defrauded Investors in Private Offerings of Shares in Publicly Traded Companies.**

From early 2017 to at least 2019, Leslie Greyling participated in a scheme to defraud more than 30 investors out of approximately $2.6 million in private offerings of shares in publicly traded shell companies. Complaint ("Compl.") ¶¶ 1-6; 29-87; Murphy Dec. ¶ 9. The scheme involved Trends, a business that offered and sold stock to investors; Rossetti, an unregistered securities broker who offered and sold stock for Trends; Clinton Greyling, Trends' President; Leslie Greyling, his father; and Bendelac, a director of Trends. Compl. ¶¶ 1, 4. Bendelac's brother-in-law, Capellini, assisted Bendelac by allowing him to use his brokerage account to place manipulative trades in one of the stocks Trends was offering and selling to investors. *Id.* ¶¶ 5, 10, 34, 80, 82-87. Although Leslie Greyling had no formal title with Trends,

he exercised authority over Trends through Clinton Greyling and Rossetti, primarily behind the scenes from the United Kingdom. *Id.* ¶ 16. Leslie Greyling was deported from the United States after he pled guilty to securities fraud in 1997. *U.S. v. Greyling, et al.*, No. 6:96-CR-00035 (M.D. Fla. 1996). The scheme started in early 2017 when Trends offered and sold shares of Alterola to investors, but did not actually own those shares or have the ability to deliver them immediately, as the Greylings and Rossetti promised investors. *Id.* ¶¶ 1, 29-31.

Trends initially offered and sold shares of Alterola, a public company which purported to be in the business of developing medicinal chewing gum. *Id.* ¶ 1. The Greylings planned with Rossetti and Bendelac to use money obtained from investors to acquire Alterola from a seller of public shell companies—companies like Alterola, that lacked meaningful assets or business operations. *Id.* ¶¶ 2, 4, 20, 28-31, 76-79. Although the payments for the purchase of Alterola would come from Trends, the Greylings and Bendelac planned to accomplish the acquisition through transfers of multiple blocks of stock from the sellers of Alterola to various entities controlled by Leslie Greyling or his associates, including an entity controlled by Bendelac named "Aleutian Equity Holdings LLC" ("Aleutian"). *See id.* ¶¶ 2, 4, 29-31, 42, 76. The purpose of using multiple entities to hold shares was to disguise common ownership and control so that the "float" of purportedly unrestricted shares would appear to be held by shareholders with no connection to the company or each other, a common tactic in a securities fraud scheme. *Id.* ¶¶ 23-25, 27-28, 42, 76.

Rossetti acted as an unregistered broker to raise money for the scheme, soliciting investors under false pretenses to purchase Alterola stock from Trends and taking 40% of their investments (which was not disclosed). *Id.* ¶¶ 29-31. Much of the information sent to investors by Rossetti was created or compiled by Leslie Greyling, and both Clinton Greyling and Rossetti regularly provided updates to Leslie Greyling about their dealings with investors and potential

4

investors. *Id.* ¶ 32. Trends raised approximately $500,000 from investors in March and April 2017 (with $200,000 owed to Rossetti and $300,000 being the cost of the Alterola shell). *Id.*.

Although Trends obtained money from investors, it did not purchase the Alterola shell at the time. *Id.* ¶¶ 2, 41. Instead, in April 2017, the Greylings and Bendelac acquired a different shell company, Pacific Media Group Enterprises, Inc. ("Pacific Media"), which purported to be in the business of developing mobile applications. *Id.* ¶ 42. The Greylings and Bendelac took control of Pacific Media by arranging for the transfers of large blocks of Pacific Media stock from various entities controlled by the seller to various entities controlled by Leslie Greyling and his associates, including Trends and Aleutian, which each received a block of 5,400,000 shares. *Id.* ¶¶ 42, 78.

Pacific Media changed its name to Extract Pharmaceuticals Inc. ("Extract") and purported to change its business to developing new technology for delivering pharmaceuticals, including cannabis oil, via chewing gum (like Alterola). *Id.* ¶ 42. From April 2017 to approximately January 2018, Trends received more than $500,000 from investors who purchased shares of the purported chewing gum business (whether in the name of Alterola or Extract). *Id.* ¶ 43. In January 2018, Extract changed its name to Token Communities Ltd. ("Token") and purported to enter the blockchain technology sector. *Id.* ¶ 43. In March 2018, the Greylings finally acquired a large portion of the Alterola shell, and Trends marketed both Token and Alterola stock to both new and existing investors. *Id.* ¶¶ 44-45. From January 2018 through July 2019, investors paid Trends an additional $1.7 million in connection with Trends' promises of shares of Token and/or Alterola. *Id.* ¶ 45.

During the scheme, the Greylings and Rossetti lied to and misled Trends' investors in myriad ways to obtain investments, quiet investor concerns, and avoid detection. *See* Compl. ¶¶ 41, 44-55. For example:

- Lying to investors about whether Trends owned the shares of Alterola stock it was selling and could deliver them immediately as promised, whether Alterola's common stock was registered with the Commission under Section 12(g) of the Exchange Act, whether Alterola was current in its periodic filings, and whether such shares would be "free trading" (meaning that investors could legally resell them without registration). *Id.* ¶¶ 39, 40, 41, 44-46, 54;

- Misleading investors that several well-known companies were "institutional investors" who had invested in Token. *Id.* ¶ 50;

- Misrepresenting to investors that the price at which Trends was offering shares was a substantial discount to the market price or to some baseless prediction about what the market price would be, while omitting to state that much of the market activity was the product of manipulative trading between and among individuals involved in the scheme. *Id.* ¶¶ 53, 59-69.

- Omitting to disclose that Rossetti would pocket 40% of each investment made. *Id.* ¶ 49; and

- Misleading investors about when they would receive their Token and Alterola shares certificates, telling them without basis that they would receive their shares soon or falsely stating that the certificates were currently being proceed by the transfer agent or were already in the mail. *Id.* ¶ 46.

Bendelac placed manipulative trades in Token as part of the scheme, to create the false appearance of active trading and inflate the price for the purpose of inducing the purchase of Token stock. *Id.* ¶¶ 59-87. Between November 2018 and May 2019, Bendelac placed a series of trades in Token stock in coordination with Clinton Greyling. *Id.* ¶ 60 & Ex. A (table summarizing trades). Bendelac sold Token stock from his Aleutian account which Clinton

Greyling or Rossetti purchased in open-market trades, *see e.g.,* Compl. ¶¶ 61-63, 68, and Bendelac sold Token stock from his Aleutian account and purchased it in his brother-in-law Capellini's account or in Bendelac's other relative's account in open-market trades, *Id.* ¶¶ 60-63 & Ex. A. These trades often comprised all or substantially all of the daily reported trading volume for Token. Compl. ¶¶ 60-66 & Ex. A. Bendelac thus manufactured the appearance of active arms-length market trading in Token stock. *Id.* Starting in May and June 2019, while Rossetti was actively soliciting investors to purchase Token stock from Trends, Bendelac and Capellini increased the volume and frequency of the manipulative trading. *See id.* ¶¶ 66-68, 82-87 & Ex. A. Capellini provided substantial assistance to the scheme and to Bendelac by giving Bendelac access to his brokerage account and funding the brokerage account, enabling Bendelac to purchase Token stock through Capellini's account while Bendelac was selling Token stock through the brokerage account of an entity controlled by Bendelac. *See id.* ¶¶ 5, 82-87.

According to bank records, Trend received $2,572,497 from investors which was then distributed among the Greylings and Rossetti. Murphy Dec. ¶ 9.

**II.     Leslie Greyling Violated the Securities Laws.**

    **A.     Leslie Greyling Violated the Antifraud Provisions of the Securities Act and Exchange Act.**

Leslie Greyling violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

Section 17(a)(1) of the Securities Act prohibits any person, in the offer or sale of any security, from employing any device, scheme, or artifice to defraud and Section 17(a)(3) prohibits any person from engaging in any transaction, practice, or course of business which operates, or would operate, as a fraud or deceit upon the purchaser. 15 U.S.C. §77q(a)(1), (3).

7

Similarly, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder make it unlawful for any person to employ, in connection with the purchase or sale of any security, any device, scheme or artifice to defraud, or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.  17 C.F.R. § 240.10b-5(a), (c).

The language of Section 17(a)(1) of the Securities Act and Rule 10b-5(a) and (c) are "expansive" and they "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019).  *Lorenzo* defined the term "device," as something "devised, or formed by design," defined a scheme as a "project, plan or program of something to be done," and defined an artifice as "an artful stratagem or trick." *Id.* (internal quotations and cites omitted).  The Court defined "act" and "practice" broadly to include things done, actions and deeds.  *See id*.

For violations of Section 10(b) and Section 17(a)(1), the Commission must show that a defendant acted with scienter, but negligence is sufficient for liability under Section 17(a)(2) and (3).  *See Aaron v. SEC*, 446 U.S. 680, 687 n.5, 695–97 (1980); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) (scienter may be established by a showing of recklessness).  Direct evidence of scienter is unnecessary; rather, "proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983).

As described above, the Greylings and Rossetti schemed on behalf of Trends to obtain investor funds to finance the purchase of a shell company by purporting to sell shares that Trends did not own and could not deliver, and then engaged in a series of deceptions to obtain additional investor funds through stock offers and sales, quiet investor concerns, and avoid detection. Compl. ¶¶ 1-3, 6-8, 29-34, 37-55.  The Greylings and Rossetti incorporated manipulative trading into the scheme by using coordinated market trades to mislead investors regarding the demand

for and price of the stock. *Id.* ¶¶ 4-5, 7, 35-37, 56-69.

Section 10(b) of the Exchange Act and Rule 10b-5(b) prohibits any person from "making any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," in connection with the purchase or sale of a security. 15 U.S.C. §78j(b). For purposes of Rule 10b-5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Section 17(a)(2) of the Securities Act prohibits any person from in the offer or sale of a security, "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. §77q(a)(2). The misstatement or omission must be material in that there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

Leslie Greyling violated Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by making untrue statements of a material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. As described above, in stock purchase agreements pertaining to Alterola sent to investors falsely represented that: (i) Trends owned the shares for sale and could deliver them to investors simultaneously upon their payment, (ii) Alterola was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was up-to-date on filing all required reports with the Commission, and (iii) that the shares would be free trading, meaning the investors would be immediately free to trade

them legally. *Id.* ¶¶ 39, 40, 41, 44-46, 54.  Further, the Greylings and Rossetti emailed potential investors an introduction for an investment opportunity in Token that falsely stated Token had "over 50 institutional investors such as AT&T Mobility, Bank of America, G[E] Capital, Comcast to name a few" omitting to state that these well-known companies had not acquired their shares as investments but had received rights to the shares as creditors in Token's predecessor's bankruptcy proceeding, and never even claimed their shares from the transfer agent. *Id.* ¶ 50.  The Greylings and Rossetti did not disclose to potential investors or investors their truthful understanding of the actual market conditions for the securities Trends was offering and selling, i.e., the existence of manipulative trading that created the false appearance of trading volume and an inflated price.  *Id.* ¶¶ 35-37, 39, 53, 56-87.  Moreover, the Greylings and Rossetti did not disclose to investors that 40% of their payment for shares would go to Rossetti for soliciting their investment. *Id.* ¶¶ 31, 49. Trends received approximately $2.6 million from investors to whom they had communicated these misleading statements and material omissions of fact in connection with the offer, purchase or sale of securities. *See id*. ¶¶ 6, 38, 43, 45, 55.

**III.    The Court Should Enter the Proposed Final Judgment Against Leslie Greyling.**

    **A.    Permanent Injunctions Are Appropriate.**

The Securities Act and the Exchange Act provide that the Commission may seek a permanent injunction against further violations of the federal securities laws, as well as other equitable relief that "may be appropriate or necessary for the benefit of investors."  15 U.S.C. §§77t(b), 78u(d)(2), (d)(5).  A court may issue a permanent injunction if the defendant's conduct demonstrates a reasonable likelihood of further violations.  *See SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003).  When assessing the likelihood of recurrence, courts consider the egregious or isolated nature of the violation, the degree of scienter, and the extent to which the defendant recognizes the wrongfulness of his conduct.  *See id*.

Here, the need for a permanent injunction against Leslie Greyling is strong given the nature of the fraudulent scheme, his prior securities fraud conviction, and the likelihood that he will continue to make such schemes his business. Leslie Greyling, acting on behalf of Trends, exhibited a high degree of scienter. Leslie Greyling has not appeared in this case to acknowledge his conduct. A permanent injunction prohibiting violations of the antifraud and registration provisions is thus necessary to protect investors against the potential that Leslie Greyling will defraud more investors in the future.

### B. A Penny Stock Bar Should be Imposed on Leslie Greyling.

Under Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act, courts have the equitable authority to bar any person from participating in offerings of penny stocks if that person was participating in the offering of a penny stock at the time of the misconduct. *See* 15 U.S.C. §§77t(g); 78u(d)(6); *SEC v. Weed*, 315 F. Supp. 3d 667, 671 (D. Mass. 2018); *SEC v. Spencer Pharm.*, No. 12-cv-12334-IT, 2015 WL 5749436, at *8 (D. Mass. Sept. 30, 2015). A "person participating in an offering of penny stock" includes "any person engaging in activities with a broker, dealer or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock." 15 U.S.C. §§77t(g)(2); 78u(d)(6)(B). A "penny stock" is defined in Section 3(a)(51) of the Exchange Act and in Rule 3a51-1 thereunder as equity securities that do not meet certain exemptions (essentially many stocks that do not trade on a national securities exchange and that trade under $5 per share and whose issuers do not meet certain thresholds of tangible assets or revenue). *See* 15 U.S.C. §78c(a)(51). "The standard for imposing [a penny stock] bar essentially mirrors that for imposing an officer-or-director bar." *Weed,* 315 F. Supp. 3d. at 677 (internal quotations omitted); *see SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) (standard for imposing an officer or director bar weighs: "(1) the egregiousness of the underlying securities law violation; (2) the

11

defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.") (internal quotations omitted).

During the Relevant Period, the stock of Alterola and Token were "penny stocks" as set forth in Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder. *See* Compl. ¶ 20; Murphy Dec. ¶ 15. Leslie Greyling was "participating in an offering of penny stock" through the scheme described in the Complaint because he offered and sold penny stocks to investors in private transactions. Leslie Greyling's conduct was egregious for the reasons described above. *See* Compl. ¶¶ 1-2, 6, 20, 37-41, 43-47, 51-55; Murphy Dec. ¶15. The Court should bar Leslie Greyling from further participation in the offering of penny stocks to deter him from continued misconduct in this area.

### C. Leslie Greyling Should Be Ordered to Pay Disgorgement and Prejudgment Interest.

Though long recognized as an available remedy in Commission enforcement actions, Section 21(d) of the Exchange Act now expressly authorizes the Commission to seek disgorgement for violations of the federal securities laws. *See* 15 U.S.C. §78u(d)(7). The Supreme Court has reaffirmed the Commission's authority to obtain disgorgement for violations of any provision of the federal securities laws. *See Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020). Construing the Exchange Act provision that allowed for equitable relief that benefited investors, the Court held that, "[a] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief under [15 U.S.C.] §78u(d)(5)." *Id.* Disgorgement is a "profit-based measure of unjust enrichment" that is measured by the defendant's "wrongful gain," and is ordered to reflect the "foundational principle" of equity that "it would be inequitable that a wrongdoer should make a profit out of his own wrong." *Id.* at 1943 (internal

12

quotations omitted); *Sargent*, 329 F.3d at 40 (disgorgement "is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws"); *SEC v. Williams*, 884 F. Supp. 28, 30 (D. Mass. 1995) (disgorgement is intended to deprive defendants of their "ill-gotten gains").

The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation" and the "risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004); *SEC v. Navellier & Assocs, Inc.,* No. 17-cv-11633, 2021 WL 5072975, *1–2 (D. Mass. Sept. 19, 2021) (applying this standard after *Liu*); *SEC v. Yang*, No. 15-cv-2387, 2021 WL 1234886, *3 (C.D. Cal. Feb. 16, 2021) (same).

The proposed judgment would make Trends and Leslie Greyling jointly and severally liable for disgorgement. Where a person and an entity's violations are "so closely intertwined," they will be held jointly and severally liable for disgorgement. *See Locke Capital*, 794 F. Supp. at 369-70 (holding CEO jointly and severally liable with defendant entity she controlled); *SEC v. Wyly*, 56 F. Supp. 3d 394, 406 (S.D.N.Y. 2014) (joint and several disgorgement is appropriate when entities have collaborated or worked closely together). In this case joint and several liability between Trends and Leslie Greyling for disgorgement is appropriate because Leslie Greyling exercised authority over Trends through Clinton Greyling and Rossetti and his financial benefit from the scheme was inextricably intertwined with Trends' profits. Compl. ¶ 16.

The Commission's disgorgement calculation focuses, as *Liu* commands, on the net profits wrongfully earned from facilitating securities fraud. *See* Murphy Dec. ¶¶ 10-11. According to Trends'' business records and bank account statements reflecting deposits of investor monies related to the fraudulent scheme and expenditures, Trends received gross proceeds of $2,572,497 from investors to whom it offered and sold Alterola and/or Token stock, and made payments

totaling $797,750 to Rossetti representing his 40% cut of the funds he personally solicited for the scheme. Accordingly, Trends realized a net profit of $1,774,747. *See id.* In light of Leslie Greyling's control of Trends and its profits, he should be required to disgorge that sum on a joint and several basis.

The Commission also seeks prejudgment interest. "Courts have recognized that an assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws." *Sargent*, 329 F.3d at 40 (internal citations omitted); *SEC v. Druffner*, 517 F. Supp. 2d 502, 512 (D. Mass. 2007) (the "First Circuit endorses the award of prejudgment interest in securities violations" and awards it "to prevent the defendant from receiving the benefit of what would otherwise be an interest-free loan"). The Court has broad discretion whether to grant prejudgment interest and what rate to use for calculation. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476–77 (2d Cir. 1996) (using IRS underpayment rate); *SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 369 (D.R.I. 2011) (same); 17 C.F.R. §201.600(b) (Commission Rules of Practice state that prejudgment interest is computed at IRS underpayment rate, compounded quarterly). Prejudgment interest is calculated for the entire period from the time of a defendant's unlawful gains to the entry of judgment. *See First Jersey,* 101 F.3d at 1477.

By virtue of the time value of money, Trends and Leslie Greyling received an additional benefit from the money they made from the scheme it should be obligated to repay this amount. The Commission proposes the use of the IRS underpayment rate, compounded quarterly, and has computed prejudgment interest using this method. *See* Murphy Dec. ¶ 12 and Exhibit A. Applying the compounded rate for each calendar year, Trends should pay prejudgment interest of $361,798. *Id.* The Commission requests that the Court order Leslie Greyling to pay the total

amount of disgorgement and prejudgment interest of $2,136,545 on a joint and several basis with Trends.

### D. Leslie Greyling Should Be Ordered to Pay a Civil Penalty of $446,458

The Commission respectfully requests that the Court impose a civil penalty against Leslie Greyling in the amount of $446,458—two third-tier penalties, one for each issuer whose stock was sold through the scheme. Under both the Securities Act and the Exchange Act, courts can impose penalties in civil injunctive actions not to exceed the greater of: (i) the gross pecuniary gain to a defendant as a result of a violation, or (ii) a specified amount per violation, depending on whether the violation falls in the "first-tier," "second-tier" or "third-tier." *See* 15 U.S.C. §77t(d)(2); §78u(d)(3)(B); *see also Locke Capital*, 794 F. Supp. 2d at 370 (describing three-tier penalty scheme). Third tier penalties are available when the violation, like Leslie Greyling's here, involved "fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement," and the violation directly or indirectly results in substantial losses or creates a significant risk of substantial losses to other persons. *See* Compl., ¶¶1, 3, 42, 72-77, 100 (explaining the risks of losses to investors in the securities sold through defendants' scheme). For a third tier penalty against an individual, the amount for each violation is $223,229. *See* Inflation Adjustments to the Civil Monetary Penalties Administered by the SEC available at: https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm. (last accessed April 6, 2023).

Courts in this district have ordered third tier penalties for egregious conduct in pennystock fraud cases. *See SEC v. Tobin et al.*, No. 18-CV-12451 (D. Mass. judgment entered against Daniel Lacher on April 22, 2022); *SEC v. Sharp et al.*, No. 21-cv-11276 (D. Mass. judgment entered against Frederick Sharp on May 12, 2022). A third-tier penalty for Leslie Greyling also comports with the general factors that courts look to in imposing civil penalties:

15

(1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition. *See SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003), *aff'd sub nom SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005). As described above, Leslie Greyling's conduct played an integral role in a fraudulent scheme that preyed on investors and involved violations of the antifraud provisions of the federal securities laws. He was previously convicted. of securities fraud (U.S. v. Greyling, et al., No. 6:96-CR-00035 (M.D. Fla. 1996)), and he has not appeared in this case after being validly served with the summons and complaint in the United Kingdom. A third tier penalty is necessary to recognize the seriousness of Leslie Greyling's violations and deter future violations.

Although the statutes provide maximum penalties "for each such violation," neither the Securities Act nor the Exchange Act prescribe how to calculate the number of violations. Several courts have determined that each instance where a defendant violates the securities laws constitutes a "violation." *See, e.g.*, *SEC v. Baker*, No. 1:19-CV-02565-LMM, 2021 WL 9385893, *8 (N.D. Ga. Nov. 8, 2021) (ordering defendants to pay, respectively, two and three tier-three penalties based on each transaction in which the defendant took on a leading role). Other courts consider the number of statutes that were violated, *SEC v. Jasper*, 883. F. Supp. 2d 915, 931 (N.D. Cal. 2010) (assessing third-tier penalties for each securities law provision/count charged), *aff'd*, 678 F.3d 1116 (9th Cir 2012) or the number of victims to whom misrepresentations were made, *SEC v. Kenton Capital Ltd.*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C.

1998) (imposing $1.2 million penalty calculated by "multiplying the maximum third tier penalty" by the "number of investors who actually sent money" to the defendant).

The Commission submits that the most appropriate way to apply a "per violation" penalty in this case is to assess one maximum third-tier amount of $223,229 for each of the two issuers whose stock was offered sold by Trends (Alterola and Token) within the five-year limitations period for which civil penalties may be awarded, for a total of $446,458.  *See* 28 U.S.C. §2462.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court enter the proposed default judgment against defendant Leslie Greyling in the form submitted.

Dated: April 10, 2023

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

//s/ J. Lauchlan Wash
J. Lauchlan Wash (Mass. Bar No. 629092)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8996 (Wash direct)
washj@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed through the Court's CM/ECF system on April 10 2023, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

//s/ J. Lauchlan Wash
J. Lauchlan Wash