UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,

v.

TRENDS INVESTMENTS INC., BRANDON ROSSETTI, CLINTON GREYLING, LESLIE GREYLING, ROGER BENDELAC, and THOMAS CAPELLINI
Defendants.

Civil Action No. 1:22-CV-10889- RGS

**DEFENDANT CAPELLINI'S MEMORANDUM OF POINTS AND AUTHORITIES IN** SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Defendant, Thomas Capellini ("Capellini"), submits this Memorandum in support of his Motion for Summary Judgment, together with his Local Rule 56.1 Statement of Material facts Not Subject to Genuine Dispute, (Pleadings, admissions, depositions and other information taken together constitute the record (the "Record")), based upon the Record, together with Declarations of Roger Bendelac ("Bendelac Declaration") and Thomas Capellini ("Capellini Declaration").

**INTRODUCTION**

This is an enforcement action brought by the Boston Regional Office of the Securities and Exchange Commission ("SEC"). The SEC alleges in its Complaint that the defendants' defrauded investors of at least $2.3 million dollars from early 2017 into the year 2020 (the "Relevant Period"), while its staff accountant, Ryan Murphy, concedes the alleged fraudulent scheme had ceased operating at some point in 2019. *See Murphy Declaration in Support of Motions for Default Judgment Docket # 118, 3.* In a thinly veiled attempt to impose scheme liability on Bendelac and Capellini, the SEC's allegations conflate several random events that have nothing to do with the

Greylings and Rossetti fraudulent scheme and, assume, without a shred of evidence, that the event or facts is just another part of the Greylings and Rossetti scheme. Without that assumption, the SEC's allegations more accurately alleged the existence of two separate schemes by two distinct groups of participants.

The SEC's allegations really describe two different schemes, only one of which if proven would be unlawful. Apparently recognizing that fact, the allegations conflate what otherwise would be seen as two separate fraudulent schemes. In doing so, the SEC unwittingly is manipulated by Clinton Greyling, who told the SEC what it wanted to hear. That Clinton's allegations were not supported by any objective facts did not seem to matter, the SEC assumed a series of facts were motivated by fraud and built a case against Bendelac and Capellini on the back of Clinton Greylings specious allegations that they never tested.

The Record does not support the SEC allegations that Bendelac both participated in, and aided and abetted, an unlawful fraudulent scheme orchestrated by the Greylings and Rossetti. In this Motion, Capellini seeks summary judgment in his favor based upon two arguments; First, because there is no genuine dispute of material facts that a reasonable jury could resolve against Capellini to find him liable as an aider and abettor. Second, Capellini argues that the Record does not contain sufficient evidence of an issue of fact, material to the outcome of that case, which is in genuine dispute, such that a jury could find Bendelac liable as a participant in the unlawful fraudulent scheme as alleged by the SEC. Thus, if Bendelac was not a participant in the alleged scheme, there is no primary violation Capellini aided and abetted, so he is entitled to summary judgment.

**BACKGROUND AND CONTEXT DRAWN FROM EVIDENCE IN THE RECORD AND FACTS NOT SUBJECT TO SUBJECT OT GENUINE DISPUTE.**

## I. Allegations the Greylings, Rossetti and Trends Orchestrate Scheme One.

The SEC alleges Brandon Rossetti ("Rossetti"), Clinton Greyling, his father, Leslie Greyling (collectively the "Greylings"), through an entity named Trends Investments, Inc. ("Trends"), owned and controlled by Clinton Greyling, offered to sell free trading shares of at least two microcap ("penny stocks") issuers to public investors, based upon materially false and misleading statements of fact, including statements portraying the shares of the company were already profitable and trading at prices above what they would pay for free trading shares available to them from Trends.

Their sales pitches were supported, according to allegations in the Complaint, with real trade data showing trading in shares of either Token communities, Ltd ("Token") or Alterola Biotech, Inc. ("Alterola"), on the Over-the-Counter market ( "OTC Market") at higher prices, on trade volume manipulated by the defendants to depict an active market for trading the stocks at the inflated prices. The SEC alleges in its Complaint that this fraudulent scheme took place during the years 2017 through 2020, although more recently concedes the scheme ended during 2019, in Ryan Murphy's sworn Declaration in support of the SEC's Motions for Default against the Greylings, Trends and Rossetti. Investors doing business with Trends lost, the SEC alleges, $2.3 million dollars in the Complaint that, interest morphed to $2,560,000.00 according to Murphy's Declaration supporting entry of Default Judgments.

To connect Bendelac to the alleged scheme, the SEC relies on the allegations of the very individual it alleges was the architect of the fraudulent scheme at issue. Despite a Consent Agreement requiring Clinton Greyling to cooperate with the SEC, and testify honestly when called upon, after learning a w that defendant Bendelac had been permitted to see the Notes of

what Clinton Greyling had said to agents associated with the U.S. Attorney's investigation of the Greylings fraudulent scheme, Clinton Greylings declined to answer any questions when he appeared for his deposition. Instead, he asserted his fifth Amendment rights. In doing so, Clinton Greyling violated the terms of his Consent Agreement with the SEC.

That the Record does not support the fiction Clinton Greyling told the Government, and when called to explain his unsupportable allegations, he asserted his right not to incriminate himself, is compelling evidence that Clinton Greyling lied to the SEC about Bendelac having been part of the unlawful scheme. For reasons that remain unknown, the SEC has not dismissed this case against defendants Bendelac and Capellini.

## II.    SEC Alleges Bendelac uses Capellini's Account to Conduct a Second Scheme to Induce Investors to Buy Shares of Token from Trends.

The SEC's allegations described two separate schemes, but with the false allegations of Clinton Greyling, the SEC attempts to conflate the two alleged schemes into a single "scheme that evolved over time," with Clinton Greylings false allegation that Bendelac participated in a fraudulent sales pitch to a Trends client being solicited to buy shares of Alterola. Bendelac, it is alleged, bought 100 shares of at different stock, so Leslie Greyling and Rossetti could claim, falsely, when soliciting a Trends client to buy Alterola shares from Trends that his prior purchase of the stock Bendelac had just, allegedly, manipulated to $4.50 per share, was trading at $4.50 per share for a profit of more than 2 million dollars. With that success, the client they hoped for would buy Alterola. The client did not buy the shares of Alterola.

There is no allegation that Bendelac traded shares of Alterola. Instead, the SEC attempts to connect Bendelac to their scheme with the false allegations of Clinton Greyling connecting Bendelac to Rossetti's and Leslie Greylings solicitation of a Trends' client to buy shares of

Alterola. No evidence supports the allegations made in the Complaint, but there is little doubt Clinton Greyling was the source of the allegations. Based upon these unsupported allegations, the SEC alleges, Bendelac's single trade makes him part of what Capellini argues is Scheme One's manipulation of Alterola and Token. Doing so potentially exposes Bendelac to the totality of the investors' losses; not just the losses of those caused by the alleged manipulation of Token shares that the SEC cannot quantify separate from losses attributable to Alterola.

In what Capellini argues are allegations of a separate scheme, "Scheme Two", the SEC alleges Bendelac entered sell orders in his Aleutian Equity Holdings LLC ( " Aleutian") account for a specific number of Token shares, at a specific price well above the market, and at approximately the same time entered buy orders for Tokens shares on the same terms he places for the Aleutian sell order. In doing so, Capellini's account almost always ended up as the buyer of Aleutian's Token shares at the inflated price, according to the SEC.

The SEC alleges that Bendelac was not entering lawful trades, but entering trades to induce clients of Trends, and other investors to buy shares of Token from Trends or the marketplace that Bendelac manipulated by making the trade volume depict a liquid market for orders at or above he reported price of Bendelac's trade between Aleutian and Capellini. The Record provides no credible support for the SEC's allegations. Other than relying on the bogus allegations of Bendelac's unlawful conduct in connection with Scheme 1 to explain why Bendelac orchestrated Scheme 2, the scheme defies logic. There is no allegation, nor evidence in the Record, tending to evidence the Scheme 1's Defendants compensated Bendelac or Capellini for assisting their fraudulent sales. In fact, Ryan Murphy's Declaration dated April 10, 2023, reveals that Trends sales of Token and Alterola shares combined brought less than half the amount of money than the prior year, suggesting Trends was not actively soliciting investors to even buy Token shares. There is no

dispute in fact that Trends was contacted by the SEC about its sales of Alterola and Token in the second half of 2019.

## III. SEC Alleges Capellini Provided Substantial Assistance to Bendelac and Scheme 2.

The SEC alleges Capellini willfully assisted Bendelac and Scheme 2 by giving him access to Capellini's IRA account, funding it with $100k, and permitting him to buy shares of Token that Bendelac's Aleutian brokerage account was selling. Clinton Greyling was in a Drug Rehab facility in the post- May 2019 period. Bendelac, the SEC alleges, was given access by Capellini to a brokerage account opened by Capellini, funded with $100,000.00 and permitted to buy or sell securities with the money.

Bendelac used the Capellini account to invest more than $90.000.00 dollars buying shares of Token. The SEC alleges that Bendelac would enter orders to sell a specific number of shares, at a price per share above the actual quoted price. At approximately the same time, Bendelac would enter a buy order for Capellini's account, for the same number of shares at the same price, Bendelac put on Aleutian's sell order. The trades would be matched, the SEC alleges.

Bendelac's trading, the SEC argues would result in the OTC market reporting shares of Token were trading at the price the SEC contends was inflated by Bendelac's controlling both the buy and sell side of the shares traded, and that the market now depicted a liquid and actively traded market existed at the inflated price for shares of Token. Trends would, as before, use that materially false and misleading trading information to entice clients and potential clients to purchase shares of Token from Trends at the lower price, thus profiting on paper instantly, according to the SEC's Complaint.

## IV. Trends Learns it is Under Investigation, Clinton Greyling Enters Drug Rehab---Aleutian Sells Capellini Shares of Token over the course of a year.

According to the SEC's Complaint, Bendelac's Aleutian Equity Holdings, LLC ("Aleutian"), brokerage account began selling shares of Token to a new account opened by Capellini and funded by Capellini. The SEC contends that Capellini opened a new brokerage account, funded it with $100,000.00. It further alleges, Capellini opened two bank accounts in the name of an LLC he owned and controlled. Capellini gave Bendelac access to enter buy and sell orders in the new brokerage account. Thereafter, Bendelac began purchasing shares of Token stock in Capellini's account with funds Capellini funded the account with. Those facts are not in dispute.

According to the SEC's allegations, Capellini opened the new account and funded it to enable Bendelac to conceal his manipulation of price of, and volume in, Token shares, all as part of the scheme to entice investors to buy from Trends, shares of Token at below market prices. The Record offers no support for the SEC's allegation. The Declaration of Ryan Murphy from the SEC, Document 119 on the Docket reveals that Trends 2019 combines sales of Token and Alterola produced revenues of only $422,989 for the year, down from $1.232,000 million in 2018 which was up from $ 917,000 in 2017, a year where Bendelac had not traded one single share of Token which he only owned in August 2017 when delivered to him under the previous name Extract Pharmaceuticals Inc. Combined with the undisputed fact that the Greylings were made aware of the SEC's investigation of their conduct only months after Capellini's account began acquiring Token shares. The Bendelac/Capellini trading in Token during the 12 months beginning in June 2019 is compelling evidence that Bendelac was not part of Scheme One, not partners with the Greylings, and buying Token in Capellini's account to inflate its share price of falsely depict market liquidity as part of an effort to convince Trends' clients to buy shares of Token.

Capellini maintains that he gave Bendelac access to trade his new rollover account because Bendelac had been given access to all Capellini's investment accounts for many years. The only difference this time was that Capellini and Bendelac had agreed that if possible Bendelac would try to buy shares he would sell from Aleutian's account, an agreement that occurred on different illiquid shares not subject of the Complaint or any other controversy, in prior years, and that resulted then in an economic benefit to both. In doing so, Bendelac would use some of the money to advance unpaid reimbursable expenses and consulting fees. *See Generally, Capellini Dec.* Reimbursement of expenses and payment of fees, according to their agreement on consulting, were due when Bendelac's clients paid. So, with delays in one of their projects, and the Trade tensions with China that made one of their main 2019/2019 project slow down, fees and expense reimbursement had ground to a halt.

## V. The Goal of Both Alleged Schemes was to Entice Investors to Purchase Shares of Token from Trends According to the SEC Allegations.

The operational mechanics of the alleged schemes were different, according to allegations in the Complaint. The allegations seemingly argue that each scheme shared a common objective, inflating the share price of Alterola and/Token stock through trading on the OTC Market, to depict falsely, an active and liquid market for the manipulated shares, all for the common purpose of convincing investors to buy shares of Trends and Alterola at prices Trends was offering well below the market price that clients did not know had been manipulated to depict values that in truth were not accurate.

To accomplish this goal, the SEC alleges in its Complaint, the mechanics of how the defendants orchestrated two fraudulent schemes. One scheme is based upon the allegations of Clinton Greyling. Without Clinton Greylings' testimony, the SEC cannot make out a prima facie

case against Defendant Bendelac relating to his alleged participation in Scheme One. The Record, as shown below, contains scant evidence corroborating Clinton Greylings' allegations. The SEC alleges that Trends Investments Inc. ("Trends"), Clinton Greyling, Leslie Greyling (the "Greylings"), and Brandon Rossetti orchestrated a scheme to sell shares of free trading stock issued by companies whose shares traded on the OTC Market. The Greylings owned and controlled Trends, although official filing corporate records show sole ownership and control by Clinton Greyling. The Greylings would acquire penny stock shares in the name of Trends. Trends, through Rossetti and Clinton Greyling would solicit investors to buy the shares Trends offered. The Greylings and Rossetti would, allegedly, provide investors with false and misleading facts about the company. Allegedly, investors were led to believe the shares would soon increase in value, and in many cases, they were already trading at a price per share above where Trends was selling them.

VI. **Clinton Greylings False Statements to the SEC and U.S. Attorney are revealed to Bendelac**.

During Discovery, the SEC made available to Bendelac for review only, heavily redacted notes taken by government investigators attending Clinton Greyling's Proffer, informed Bendelac of the source of the SEC's allegations he contends are a fiction. Allegations of his partnering with Clinton and his father to purchase Token, the issuer of Token stock, allegations of coordinated trading with Clinton and others, as well as efforts to manipulate the price of Token's Shares and depict falsely the appearance of liquid market to trade shares of Token all originated with Clinton.

After reading the Notes from Clinton Greyling's Proffer to the U.S. Attorney's Office in Boston, Bendelac asked Leslie Greyling he never mentioned that the SEC was investigating him, Clinton, and Trends back in 2019. Leslie responded saying, according to Bendelac, with a "why would I tell you about such a personal matter that did not concern you. Leslie Greyling's

conversation with Bendelac indicated to Bendelac that Leslie was aware Bendelac had been given limited access to notes relating to Leslie's son's proffer. Bendelac claims he did not divulge the content of those notes. Instead, Bendelac asked Leslie if he was aware of what Clinton told the SEC and the U.S. Attorney about him (referring to Bendelac).

After a long uncomfortable silence that told Bendelac Leslie knew what Clinton had done thinking it would save his own neck. When he finally spoke, Leslie Greyling began by apologizing profusely for what his son had done, but he had been frightened and thought that was his only choice. Leslie Greyling was aware that Bendelac's wife had lost her job when the SEC had contacted her employer when Clinton Greyling's allegations connected Bendelac, Bendelac's wife and her status as the account representative for Aleutian. Bendelac's wife was terminated following the SEC's inquiry, despite there being no evidence of her wrongdoing.

Leslie told Bendelac he thought the SEC misinterpreted or otherwise changed what Clinton had told them. Leslie added that Clinton had just been released from a mental health facility to address his drug addiction, following an attempt to commit suicide, when he had to meet with the SEC. He was then required to meet with the US Attorney's office in Boston. He put it off for a week or so, but eventually had to go in and talk with them as well. BENDELAC never disclosed the details of what he knew from the Notes he had been given access to. But Leslie's statement that he thought Clinton's claim he and Bendelac had been coordinating trades of Token shares to convince investors to buy shares from Trends was harmless because Bendelac was not trading Token shares back then. While Leslie apparently had no idea Bendelac had actually sold small lots of Token when he thought he could, or that in the summer of 2019, and into 2020, in the midst of the SEC investigation, Bendelac was selling shares of Token to his brother in law's IRA to free up money to advance Capellini's fees and expense reimbursements of almost $40K.

Bendelac was shocked at Leslie's candor. He asked him why Clinton would make up inaccurate facts and why Leslie had not told him any of this until now. Leslie Greyling's response was poignant. Clinton was scared. He had this rehab thing, and "We" never thought Clinton's story would ever have these consequences for you. When Clinton gave his proffer in the fall of 2020, we learned that you were staying in Stockholm and your wife was in the States. I could only imagine how mad your wife must have been about all this. I honestly really never thought you would be going back to New York.

Leslie said Nathan ("Geoffrey Nathan, Esq., attorney for Mr. Clinton Greyling) convinced Clinton he had to give the Government someone. Clinton had no one to give so he said what he said about you. If his allegations did not pan out, he would have bought himself time to figure out some other option.

This all tends to explain why, despite a consent agreement requiring his cooperation in the case and at trial, when Clinton Greyling sat down in front of a computer screen depicting half a dozen lawyers and Bendelac all ready to see if Clinton Greyling would admit he had made false statements, lie to Bendelac face to face, or violate the terms of his Consent Agreement and assert his 5th Amendment right to remain silent and not incriminate himself. Clinton Greyling asserted his rights under the fifth amendment and refused answer any questions. Since doing so, the SEC has not dismissed the claims against Capellini nor even Bendelac, despite that a clear concession that Clinton Greyling's allegations were false. Only that conclusion explains why two months from trial, there is little to know support for the allegations against Bendelac and Capellini.

## LEGAL ARGUMENT

### I. Legal Standard for Summary Judgment.

Rule 56 of the Federal Rules of Civil Procedure (the "Rules"), provides in substance that Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A dispute is genuine where the evidence is such that a reasonable jury could resolve the dispute in favor of either party. *See SEC v. Ficken*, 546 F.3d 45, 51 (1st Cir. 2008). A fact is material "when it has potential of changing a case's outcome." *Doe v. Trs. Of Bos. Coll.*, 892 F.3d 67, 79 (1st Cir. 2018). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). *Id. See Generally, SEC Opposition to Bendelac Motion for Summary Judgment.*[1]

**1. Scheme Liability Under the Securities Exchange Act of 1934 ("Exchange Act"), and the Securities Act of 1933 ("Securities Act") Anti-Fraud Provisions.**

In applicable part, the Exchange Act prohibits the purchase or sale of any security while (1) employing any device, scheme, or artifice to defraud; or (2) engaging in any act, practice, or course of business that operates as a fraud or deceit upon any person, in connection with the purchase or sale of a security. *See* 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5(a), (c). The Securities Act contains similar provisions but limits itself to those that use a scheme to offer for sale, or sell, any securities over a national exchange. See, 17(a) of the Securities Act at 15 U.S.C.§77q(a).

Under either statute, excepting 17(a)(3), evidence must show that Bendelac intended to falsely inflate the price of Token shares to induce public or private placement investment candidates to buy shares of Token. While proof of negligence as Bendelac's state of mind when he was selling shares of Token, and purchased by Clinton Greyling, Rossetti, or even Capellini, can be proven with a showing of negligence, under Section 17(a)(3) of the Securities Act, all claims under

[1] *Capellini does not dispute the law and authorities as set forth in the SEC Opposition to Bendelac Motion for Summary Judgment. Therefore, Capellini adopts much of the recitation of Law in the SEC Opposition.*

the remaining Section 10, and Section 9 claims under the Exchange Act, and Section 17 of the Securities Act, require prove of specific intent or recklessness.

To hold Capellini liable for aiding and abetting Bendelac's direct participation the unlawful schemes as alleged by the SEC, they will have to not only prove the scheme was unlawful, Bendelac was a participant, and that Capellini knew Bendelac was engaged in a scheme to inflate the price of Token free trading shares, and making it appear to public investors that there existed a market for Token share at prices higher than their actual value.

**A. Bendelac's Trading for Capellini Was Not Part of a Fraudulent Scheme He Operated.**

Here, no reasonable jury could find Bendelac's sporadic trading in Token shares is sufficient to prove Bendelac was a direct participant in Scheme 1, or that he aided and abetted Greylings and Rossetti's sales of Token and Alterola shares to Trends clients. Despite the existence of default judgments against the primary violators in Scheme 1, the SEC must still prove all aspects of Scheme 1, if proceeding on the Clinton Greyling's bogus claim that BENDELAC was a partner with them when they acquired Trends. Likewise, the SEC must prove Clinton Greylings allegations they he and Rossetti were manipulating the price of Token shares, by coordinating trades with Bendelac and one another. They must do so without the testimony of Rossetti whose whereabouts are unknown, Leslie Greylings who resides out of the United States, and Clinton Greyling who asserted his fifth amendment rights. The help of an expert will not be available to the SEC since it has not identified an expert-witness by the required deadline.

If the scheme is proven, the Record will provide little to know evidence one could construe as undermine the contentions of Bendelac and Capellini, that claim their trading was intended only to provide Bendelac liquidity to sell some shares of Token to help advance money to Capellini to meet his living expenses. Perhaps what is most surprising, is that the Record does not contain any

evidence, not connected to Clinton Greylings statements to the SEC Staff or his Proffer that supports an allegation that Bendelac or Greyling knew Trends was offering to sell free trading shares of any penny stock, let alone Token shares, to investors and Trends clients. The only placement efforts Bendelac was ever made aware of was a placement agreement seeking funding for Token Community's business plans in the Summer of 2018 and for which he introduced an acquaintance at Merrill Lynch to Ms. Adiba then COO of Token that he met during an Exhibit of emerging companies and start-ups organized by a middle market brokerage firm in New York.

Moreover, no experts will be permitted to provide testimony about whether any of the subject trading, or reported pricing, market maker standing bids/offers, or even the meaning of information reported on the OTC or, lastly, whether in fact any of Bendelac's trading, in the context presented at trial, would be considered a form of unlawful market manipulation of the shares of Token.

To the same end, the Record contains no credible support for allegations that Bendelac orchestrated a scheme to entice investors to purchases shares of Token from Trends or in the market, by purchasing shares of Token for Capellini's IRA account, on the same terms he directed Aleutian to sell the same number of shares. The Bendelac and Capellini trades were not intended to, nor could they have been, part of any scheme to inflate the price of Token free trading shares and depict a liquid market for the shares at the inflated price all for the purpose of enticing clients of Trends, and other investors to buy shares of Token from Trends. It is not disputed that Trends was not actively soliciting investors to purchase Token shares from Trends.

No reasonable jury could find, on the evidence contained in the Record, that Bendelac acted with specific fraudulent intent when causing Aleutian to sell shares of Token. Likewise, no reasonable jury could find that on the evidence contained in the Record that Capellini knew, or he

was reckless in not knowing, Bendelac was engaged in a fraudulent scheme. To the contrary, the Record shows that Bendelac's conducted the trading in Token consistent with Capellini's explanation that Bendelac sold Aleutian's shares of Token on the OTC market on the same terms Capellini paid for the shares Bendelac purchased for his account. And when proceeds from the sales freed up available cash, or when cash was unexpectedly received by Bendelac, he quickly advanced funds to Capellini to help him improve his cash position to pay business operating expenses and living expenses.

**B. Capellini Did not Aid and Abet Scheme Two.**

Nothing in the Record supports allegations that Capellini knew or was reckless in not knowing of Bendelac's alleged unlawful conduct. Likewise, there is no evidence to support the allegation that Capellini provided Bendelac with access to his IRA and the cash buying power in that account with the intention of assisting Bendelac's unlawful conduct. Without proof of Bendelac's primary violation and without proof of Capellini's specific intent to defraud, Capellini cannot be found liable as an aider and abettor.

To prevail, the jury must find that Bendelac acted with scienter, but negligence is sufficient to establish liability under Section 17(a)(3). *See Aaron v. SEC*, 446 U.S. 680, 687 n.5, 695–97 (1980); *Aldridge v. A.T. CrossCorp.*, 284 F.3d 72, 82 (1st Cir. 2002) (scienter may be established by a showing of recklessness). Direct evidence of scienter is unnecessary; rather, "proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983). Recklessness or willful blindness are sufficient to prove scienter. *See In re Cabletron Sys. Inc.*, 311 F. 3d. 11, 38 (1st Cir. 2002); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 155–56 (D. Mass. 2001).

2. **Bendelac Did Not Substantially Assist Rossetti and the Greyling Defendants Stock Manipulation nor Did He Individually Manipulate Token Shares So Capellini Could Not Have Aided and Abetted a Violation.**

Capellini does not contest the SEC's statement of law, including its characterization of the First Circuit's interpretation of applicable law, as it was set forth in the SEC's opposition to Bendelac's Motion for Summary Judgment, both are docketed in this case. For ease of reference, the SEC's statement of the law, as appliable, is repeated below:

A.   Aiding and Abetting

> Section 20(e) of the Exchange Act establishes liability for those who aid and abet others in securities violations. 15 U.S.C. § 78t(e). Section 20(e) provides: any person that *knowingly or recklessly provides substantial assistance* to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided. 15 U.S.C. § 78t(e) (emphasis added). Section 15(b) of the Securities Act contains a substantially identical aiding and abetting provision, with the same "knowingly or recklessly provides substantial assistance" language, concerning primary violations of the Securities Act. *See* 15 U.S.C. 77o(b) (referencing "this subchapter."). The First Circuit's test for aiding and abetting predates the Dodd-Frank Act in 2010, which expressly added recklessness to the statute's state of mind requirement. *See SEC v. Tambone*, 550 F.3d 106, 144 (1st Cir. 2008), *rev'd in part on other grounds*, 597 F.3d 436 (1stCir. 2010). (Citing *Cleary v. Perfectune*, 700 F.2d 774, 777 (1st Cir. 1983)). Under *Tambone*, "to establish a claim of aiding and abetting liability under the securities laws, the Commission must prove: (1) a primary violation was committed; (2) the defendant was generally aware that his role or conduct was part of an overall activity that was improper; and (3) the defendant knowingly and substantially assisted in the primary violation." *Id.* Accordingly, post Dodd-Frank, aiding and abetting liability can exist if the defendant was "'reckless' in relation to the primary party's violation." *SEC v. Ripple Labs*, No. 20-CV-10832, 2022 WL 762966, at *6 (S.D.N.Y. Mar. 11, 2022).

   a.   **The Record Does Not Support SEC's allegations that Capellini Aided and Abetted Bendelac's Conduct Pertaining to Schemes One or Two.**

The SEC must prove Bendelac's committed a primary violation, and that when Capellini gave Bendelac access to his IRA, and the capital in the account, to enable Bendelac purchase shares of Token for Capellini's account, Capellini knew Bendelac was part of a scheme with others and intended to use the IRA to facilitate that scheme. There is no evidence that places Capellini's denial in genuine dispute. It is not disputed that Bendelac and Capellini sought only to monetize illiquid free trading shares of Token to free up funds Bendelac could use to advance Capellini money against unpaid expense reimbursement requests and consulting fees. No evidence in the record contests the two witnesses, Bendelac and Capellini, have firsthand knowledge of their intentions.

None of the defaulted defendants can be reasonably expected to testify at trial. Clinton Greyling, whose cooperation, and Proffer to criminal authorities, made in connection with his settlement with the SEC, was not truthful. He provided false information and documents to the Government knowing their falsity, and his assertion of his fifth amendment right allows the Court to draw an adverse inference as to the truth of his allegations. In taking the bait Clinton Greyling offered, the SEC's claims against Capellini (and Bendelac), rise and fall on the success of Clinton's trial testimony. His assertion of 5th Amendment rights to avoid having to testify, means the only arguable support for its allegations tying Bendelac and Capellini to the Trends, Greylings and Rossetti conduct for which they have been abjudged by default, cannot be evidence at trial.

B. Bendelac Learns Clinton Greyling Provided the SEC and U.S Attorney with false statements and fabricated documents.

Bendelac reports that the notes he reviewed indicate the AUSA left and did not bother to return in the midst of Clinton Greyling's proffer. Bendelac learned from Clinton Greylings father, who has now apologized to him for what Clinton did, that Clinton was scared lied to the SEC because he was told he had to give the SEC and U.S. Attorney something if he expected to get a

deal. Leslie stated to Bendelac that he did not tell Bendelac any of this because neither he nor Clinton believed Bendelac would return to NYC. Leslie knew that Bendelac had gone to live in Stockholm, after his wife was fired, Roger was sued by the SEC, and the fallout from those two events had resulted in Bendelac living alone in Stockholm. According to Leslie Greyling, by the time he learned what Clinton had said to the Government about Roger, and the events that followed from Clinton's statements, he had been told by Clinton and the lawyer he hired for Clinton that Bendelac would never know what Clinton had said to the U.S. Attorney's office or the SEC, and that Clinton would not have to testify in the SEC case because the Criminal case was about to be filed and the SEC case would merge into it as part of a resolution.

It appears that when Clinton Greyling found himself looking a video screen about to be deposed by Bendelac, it came as no surprise that Clinton Greyling chose to breach his consent agreement and assert his 5th Amendment right to remain silent. He instead elected to assert his 5th Amendment Right to stay silent and avoid incriminating himself.

C. **Bendelac Did not Participate in Scheme One.**

There is no genuine dispute about material facts, the resolution of which may change the outcome of a jury's finding for or rejection of liability against Capellini (or Bendelac for that matter). The Record is devoid of evidence that a Jury could rely on to find that Clinton Greyling and Roger Bendelac communicated on days where both traded shares of Token. Absent any communication, one cannot reasonably conclude that the two coordinated their trading. There is no evidence that both Clinton Greyling and Bendelac had access to NASDAQ data feeds that would provide sufficient evidence of Clinton's and/or Bendelac's orders with quantity and price details, that one or the other could rely on to match trades. The only relevant evidence undermines the truth of Clinton Greylings baseless allegations of coordinated trading. Clinton's assertion of his 5th

Amendment rights is sufficient for the Court to draw an adverse inference as to the truth of any allegation traceable back to Clinton Greyling.

The Record contains no evidence that creates a genuine dispute of fact with respect to the purpose of Bendelac's company wires to Capellini's company bank account in 2019. Bendelac and Capellini contend the payments were advances against pending expense reimbursements and consulting fees to be paid by Bendelac's client. There is no evidence to dispute Bendelac's claim that he advanced payments to Capellini, when the trade dispute between China and the U.S.A, delayed payments from his China based client. Capellini's having come out of pocket for travel related expenses, and the delay in payment of fees left Capellini without sufficient funds to pay his bills. None of this is disputed by evidence in the Record.

Not only is there no genuine dispute as to the Bendelac/Capellini trading, but there is also no evidence that genuinely puts Capellini's lack of scienter in dispute. The same is true as to Bendelac's state of mind in facilitating the trading.

It is undisputed that other than trades after June 2019 that he himself entered in the Capellini account, Bendelac had no knowledge of when his orders were transmitted to the trader. *See, generally, Bendelac declaration.* It is undisputed that Bendelac had no ability to determine what shares Aleutian bought in the market. It is undisputed that substantially all orders on Capellini's accounts were directed by Bendelac after June 2019. Bendelac had no contemporaneous knowledge when Aleutian's sell order was filled. It is disputed that he did not know when Aleutian's sell orders were executed unless his broker called him after the order was filled, or he looked at a confirmation that came in the mail. These undisputed facts demonstrate clearly that Bendelac did not coordinate trades with Clinton Greyling or Capellini's account. The Record contains no credible evidence that nullifies Capellini's and Bendelac's contention that shares of

Token were bought in Capellini's IRA, often times being matched with Aleutian's sales, to generate funds Bendelac could use to pay his operating expenses, while also advancing Capellini funds.

## CONCLUSION

The SEC built is case around what Clinton Greyling false statements to the SEC and U.S. Attorney's Office. The statements had consequences Clinton did not foresee, according to statements made by his father. Clinton lied because he was scared and afraid to be held accountable for his allegedly fraudulent activities. In an effort to avoid prosecution or mitigate the effects of a possible criminal prosecution.

Respectfully submitted:
THOMAS CAPELLINI
By his attorney,

Steven N. Fuller (BBO No. 550224)
Litigation and Compliance Associates, LLC
2480 Presidential Way, Suite 902
West Palm Beach, FL. 33401
617 620 4732
Steven.Fuller@litcom1.com

Dated: July 14, 2023,