UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>                           **Plaintiff,**<br><br>     v.<br><br>**TRENDS INVESTMENTS INC., BRANDON ROSSETTI, CLINTON GREYLING, LESLIE GREYLING, ROGER BENDELAC, and THOMAS CAPELLINI**<br>                           **Defendants.** | Civil Action No. 1:22-CV-10889-RGS |

**SEC'S RESPONSE TO DEFENDANTS'**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Securities and Exchange Commission (the "SEC") hereby submits its combined response to Defendants Roger Bendelac's ("Bendelac") and Thomas Capellini's ("Capellini") Proposed Findings of Fact and Conclusions of Law (Dkt. Nos. 276, 277).

The evidence at trial connected Bendelac to the depth and breadth of the securities fraud scheme led by the Greylings (Leslie and Clinton), including facilitating their group's fraudulent acquisition of a shell company and fraudulent sales of shell company shares, moving shares around and distributing them to Trends Investments Inc. ("Trends") investors to suit the needs of the scheme, making a "zero scrutiny" deposit with Bendelac's broker (via his wife), and placing various manipulative market trades using multiple brokerage accounts under his control.

Bendelac's proposed findings weave around Clinton Greyling's credible trial testimony, corroborated by numerous exhibits, about Bendelac's role in the scheme as a pair of "friendly hands" to hold, transfer, and trade the shares of public company stock at the center of the scheme. To distance himself from that scheme, Bendelac ignores, mischaracterizes, and attempts

to normalize the evidence of his wrongdoing. Left facing the unavoidable facts about his trading in multiple accounts, Bendelac absolves himself with a made-up theory about the "concept of volume." In the end, Bendelac's and Capellini's explanations for their trading with each other in Token Communities Ltd. ("Token") stock remain confusing, lack credibility and record support, and lead into a cul-de-sac. The evidence at trial established that both Defendants had a motive to manipulate the market for Token stock in order to resell their Token shares for a profit, and that they tried to do so, led by Bendelac and with Capellini's knowing and substantial assistance.

I.  **Clinton Greyling Credibly Testified that Bendelac Joined and Contributed to the Fraudulent Scheme, Including by Making Improper and Artificial Trades in Token Stock**.

Bendelac attempts to play two sides of the same coin, praising Clinton Greyling for having "credibly testified" about the coordinated trading in the reverse merger business but then castigating Clinton Greyling as "not credible" when he testified about asking Bendelac to make artificial and improper trades in Token. *Compare* Defendant Roger Bendelac's Proposed Findings of Fact and Conclusions of Law ("BPF") (Dkt. No. 277) ¶ 26 *with* BPF ¶ 65. Bendelac then denies trading Token shares at the direction of Clinton Greyling. BPF ¶ 50. In essence, Bendelac's claim is that he did more when he was less involved and he did less when he was more involved.

It is Roger Bendelac, not Clinton Greyling, who lacks credibility here.

Bendelac's efforts to address Clinton Greyling's testimony are part push, part pull, and leave Clinton Greyling rooted in the same place: An imperfect person but credible witness who devoted time and effort to preparation, listened carefully to the questions, took the oath and instructions to tell the truth seriously, and provided helpful and sincere testimony—both context and detail—to the Court. It was apparent from his words and from his demeanor that Clinton

Greyling took no joy in testifying about the misconduct of a long-time family friend whom he still admires. *See, e.g.*, Tr. Day 2 (Greyling) at 43:11-44:3.

Because Bendelac has no exculpating explanation for why he agreed to make illicit and improper trades in Token stock, he casts aspersions (without basis) to argue that Clinton Greyling's testimony was not credible and was influenced by the "SEC's lawyers and the AUSA" BPF ¶ 65.

This line of questioning on cross-examination did not get off the ground and demonstrated only that Clinton Greyling's testimony was *not* altered by his perception of the SEC. Bendelac's counsel elicited on cross-examination only one matter which Clinton Greyling perceived the SEC to be "upset" about from his deposition: That he testified that he felt like he did not commit securities fraud. Trial Day 2 (Greyling) at 26:2-5. Putting aside the obvious—that the SEC's position is and has been that Clinton Greyling committed securities fraud, and that Clinton Greyling's legal characterizations of his conduct are not relevant—Clinton Greyling *repeated* this same testimony at trial when asked the same question on cross-examination:

> Q: Did you feel as though they wanted you to change your deposition testimony for purposes of your testimony in this trial?
> A: They were unhappy with me saying that I felt like I didn't commit securities fraud, sir.
> Q: Okay. Sitting here today, if I ask you again do you believe you committed securities fraud with respect to Alterola or Token, what's your answer?
> A: I'm going to state what I previously said in my deposition, sir.
> Q: No, you do not, correct?
> A: (Indicating).

Tr. Day 2 (Greyling) at 26:2-13.

Bendelac's view that Clinton Greyling either "recanted" his testimony or "was conclusively impeached" could not be further from the truth. Clinton Greyling was unequivocal that he asked Bendelac to "show a trade" in Token stock "three or four times." Tr. Day 1

3

(Greyling) at 108:21-109:3; Tr. Day 2 (Greyling) at 34:4-24. Unsurprisingly, he was not clear about the particular dates on which he made the requests, out of many dates when Bendelac sold Token stock that was purchased by Clinton Greyling, Brandon Rossetti ("Rossetti"), or Bendelac using another account. *See* Tr. Day 1 (Greyling) at 108:21-109:3; Tr. Day 2 (Greyling) at 34:4-24; Trial Ex. 276. Clinton Greyling's understandable temporal uncertainty neither contradicts nor undermines his testimony that he asked Bendelac to make trades in Token stock on multiple occasions—trades that were improper and artificial. *See* Tr. Day 1 (Greyling) at 105:10-109:23.

The bottom line is that Clinton Greyling was clear, forthright, and credible, both on direct testimony and cross-examination, that (1) he knowingly coordinated with Rossetti to make artificial and improper trades to induce investors to purchase stock; (2) he asked Bendelac to make artificial and improper trades to induce investors to purchase stock; (3) he informed Bendelac that Trends was selling shares to investors; and (4) he never provided Bendelac with any legitimate explanation for why he was asking Bendelac to trade Token stock. It is therefore clear from the trial testimony and the submitted evidence that Bendelac traded in Token stock in coordination with Clinton Greyling, and Bendelac understood he was making artificial and improper market trades in stock that Trends was selling privately to investors.

**II.     Bendelac Ignores, Mischaracterizes, or Tries to Normalizes Inculpatory Evidence.**

   **A.     Bendelac Ignores Evidence of his Deceptive Conduct and Scienter.**

Bendelac's proposed findings ignore important evidence that establish Bendelac's deceptive conduct and/or scienter, including, for example:

- Bendelac's status as a director of Trends from August 2017 through October 2019. *Compare* BPF ¶¶ 13-18 *with* SEC's Proposed Findings of Fact and Conclusions of Law ("PF") (Dkt. No. 275) ¶¶ 1, 173.

- Bendelac's awareness of numerous red flags about Leslie Greyling at the time Bendelac chose to join the scheme. *Compare* BPF ¶ 18 *with* PF ¶ 27.

4

- Bendelac's admissions that he joined the scheme to recoup $100,000 he paid as a result of a "scam" involving Irving Aronson in which Aronson had "screwed" an associate of Bendelac's out of $100,000. *Compare* BPF ¶ 38 *with* PF ¶¶ 28-32.

- Bendelac's awareness at the time he joined the scheme that it would involve a stock promotion and the subsequent references to the same, including a promotion specifically designed to promote Token's merger with Sakthi in the Spring of 2019. *Compare* BPF ¶¶ 38-41 *with* PF ¶¶ 33, 88-89, 282-286.

- Bendelac's receipt of shares of stock paid for by Trends using money Trends obtained through the fraudulent sale of shell company shares to investors. *Compare* BPF ¶¶ 35-39 *with* PF ¶¶ 12-15, 51-52, 56-75, 149-150.

- Bendelac's execution of a sham stock purchase agreement to acquire the shell company shares. *Compare* BPF ¶¶ 38-39 *with* PF ¶¶ 70-75.

- Clinton Greyling's testimony, corroborated by documents, that Bendelac was among a group of "friendly hands" who, by design, received just under 5% of the shell company's shares in the change of control transaction. *Compare* BPF ¶ 38-41 *with* PF ¶¶ 61-69, 161-164.

- Bendelac's manipulative bids of $1.00 on Extract Pharmaceuticals Inc. ("Extract") stock in Capellini's account, which dovetailed with Rossetti's claims to investors ("We are going to see a bid price of a 1 dollar any min now") and which Bendelac admitted he may have placed because he was asked to by Clinton Greyling. PF ¶¶ 187-198.

## B.     Bendelac Mischaracterizes Evidence of his Deceptive Conduct and Scienter.

Bendelac's proposed findings also mischaracterize, minimize, or attempt to excuse other important evidence, including:

- Bendelac's awareness that Trends was selling shares to private investors and the manner in which Bendelac directly and indirectly benefitted therefrom. *Compare* PF ¶¶ 33-37 *with* PF ¶¶ 167-178.

Although it is notable that Bendelac sometimes sold Token stock which Rossetti purchased, *see* Trial Ex. 276, and that Bendelac and Rossetti were both openly included in emails about Token stock sent by Leslie Greyling, *see* Trial Exs. 104, 105, it is ultimately not important whether Bendelac specifically knew Rossetti's name or communicated with him directly because Bendelac knew that Trends was selling shares to private investors. PF ¶¶ 167-178. Trends

5

continued to sell shares to investors even after the shell company acquisition to fund the company's ongoing expenses, including expenses that would help the company become current in its required periodic filings. *Id.* ¶¶ 86-87, 178. As a significant shareholder in a company with no revenue, this was of clear benefit to Bendelac, giving him a strong motive to facilitate the ongoing fraudulent sales. *See id.* ¶¶ 178, 141, 340.

The scheme charged here included allegations of material misstatements and misleading omissions directly to investors by Rossetti, but not by Bendelac. As a result, Bendelac is not charged with violating (or aiding and abetting violations of) Section 17(a)(2) of the Securities Act and Rule 10b-5(b) under the Exchange Act (as Rossetti was). The fact that the scheme included material misstatements and misleading omissions by Rossetti does not immunize Bendelac from his own culpable role in the scheme, however. *See SEC v. Sharp*, 626 F. Supp. 3d 345, 390 (D. Mass. 2022) ("Section 10(b) and Rule 10(b)-5 impose 'primary liability on any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market.'") (quoting *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003)). !

- Bendelac's distribution of Token shares to Trends investors at the Greylings' direction. *Compare* BPF ¶¶ 42-46 *with* PF ¶¶ 79-81; 124-130; 174-175.

Bendelac describes his distribution of Token shares to Trends investors as the innocuous "return" of his "excess shares." BPF ¶¶ 42-49. The evidence at trial was that Bendelac understood that he was transferring shares to Trends investors because he "was told he was sending shares to [Trends'] investors" and saw their names on an Aleutian board resolution authorizing the transfer. PF ¶¶ 79-81; 124-130; 174-175. Bendelac's uncorroborated and

6

convoluted story about his "excess shares" of Token stock does not blunt the impact of the evidence that he knew about the Trends investors generally, and specifically when he transferred Token stock to them. *See id.*

Moreover, Bendelac's retention of 100,000 "additional shares" (a) does not square with Bendelac's story about the purported value of those shares, *see* BPF ¶ 42, and (b) reflects the fluid nature of his arrangements with the Greylings and the friendly hands of co-schemers working together rather than unaffiliated individuals engaging in arms-length transactions. *See* BPF ¶¶ 42-47.

- Bendelac purposefully matching orders in Token stock, including with Clinton Greyling and with other accounts under Bendelac's control. *Compare* BPF ¶ 54 *with* PF ¶¶ 199-267, 288-289, 298-302, 311.

Bendelac states that "[m]any trades in Token were 'good-'til-cancelled' orders (GTC) several days or weeks before the trades were actually executed," but gives just three examples. *See* PF ¶¶ 203-204. That his sell-side orders were not self-expiring means little in the dormant market for Token shares where Bendelac, Clinton Greyling, and Rossetti were in control of the buy-side, opposite Bendelac's sales. *See* PF ¶¶ 94-99, 120-122, 199-241. And numerous orders by Bendelac were executed in full or in part on the same day they were placed. *See* Trial Ex. 276 (Aleutian's executed trades); Trial Ex. 154 at 4 (Feb. 19, 2019); Trial Ex. 155 at 3 (Feb. 20, 2019), 12 (April 11, 2019); 13 (April 16, 2019); 18 (May 20, 2019); 19 (May 23, 2019); 20 (May 24, 2019); 24-27 (June 12, 13, 17, and 19, 2019); 30 (Sept. 5, 2019).

- Bendelac's manipulative trades in Token stock on February 19 and 20, 2019, which raised Token's reported closing price to $2.00 per share after it had dropped to $0.101 per share. *Compare* BPF ¶ 60 *with* PF ¶¶ 216-239.

Bendelac states that his trades caused the price of Token to drop from $9.95 to $2.05 on February 19, 2019 (which is not exactly right, *see* Trial Ex. 289 (reflecting a reported closing

7

price of $0.101)), and that this is "logically inconsistent" with any intention to manipulate the price. BFP ¶ 60.

Bendelac does not explain why this is logically inconsistent—because it is not. *See id.* His point may rest on the unsupported premise that if you are manipulating the stock price it is always better to have the price be much higher. The price that Bendelac chose here was artificial, regardless of whether other prices would have also been artificial, and it fit the other arranged and artificial trades in Token by the group, *see* PF ¶¶ 212-215 (explaining the gradual inflation of Token's stock price over months by Bendelac, Clinton Greyling, and Rossetti), and the fact that he was using two relatives' money to make the purchases. *See* Trial Exs. 289-290. Bendelac has given no legitimate explanation for placing matched orders in multiple accounts for Token stock at over $2.00 per share because he cannot, particularly when the stock had just traded earlier that day at $0.101 per share. *See* PF ¶¶ 216-227. Finally, Bendelac completely ignores his trading on February 20, 2019, in multiple accounts, which raised the reported closing price of Token stock from $0.101 to $2.00 and displayed his clear intent to manipulate and skill in doing so. *See* PF ¶¶ 228-239.

- Clinton Greyling's testimony about several phone calls with Bendelac on the afternoon of February 19, 2019, just prior to Bendelac's manipulative trades. *Compare* BPF ¶ 59 *with* Tr. Day 2 (Greyling) at 39:13-15.

Bendelac claims that Clinton Greyling testified that these calls were "*likely* about personal matters completely unrelated to Token stock . . . ." BPF ¶ 59 (emphasis added). In reality, Clinton Greyling testified first that he had "no recollection" and stated, "I don't know what the phone calls would be pertaining to, I don't recall the calls from back in 2019, sir." Tr. Day 2 (Greyling) at 38:19-25. Clinton Greyling then acknowledged the existence of a personal matter and that he had been communicating with Bendelac about whether he could loan Clinton Greyling some money. Tr. Day 2 (Greyling) at 39:9-12. Clinton Greyling answered, "Yes," when

8

asked, "Is it *possible* that the phone calls on February 19, 2019 were about those issues and not Token trading?" *Id.* at 39:13-15 (emphasis added). He did not say that it was "likely," but displayed common sense in acknowledging the possibility because he could not recall the conversation. *See id.*

The communications (text messages between Rossetti and Clinton Greyling, and then phone calls between Clinton Greyling and Bendelac) are among several pieces of evidence which add context to the collective manipulative trading by Bendelac, Clinton Greyling, and Rossetti during this episode to support the inference that they were acting *together* on this date to rehabilitate Token's stock price, rather than independently. *See* Trial Exs. 289-290; *see also* PF ¶¶ 218-239.

Bendelac points to his Skype messages with Clinton Greyling about other issues to suggest a competing inference about the content of the phone calls. BPF ¶ 59. But those communications occurred early in the morning on February 19, *before* the mid-day trade that brought the price of Token stock down to $0.101 per share. *See* Trial Ex. 1 at 60-62; Trial Ex. 289. By contrast, Rossetti's and Clinton Greyling's own manipulative trades on that date reveal that the Token stock price crash became a matter of importance to them after it happened. *See* PF ¶¶ 218-239. In any event, group members with a shared purpose and understanding do not always require specific instructions to act on behalf of the group, and Bendelac's intent to manipulate the price is apparent from the trading itself. *See* Trial Exs. 289, 290; *see also* Trial Ex. 102 (email from Leslie Greyling to Clinton Greyling and Brandon Rossetti noting "LAST TRADE $2.25 PER SHARE").

## C. Bendelac Attempts to Normalize Evidence of Other Misconduct Reflecting his Scienter.

Bendelac's proposed findings seek to normalize, without basis, certain aspects of Bendelac's other misconduct which reflect his intent with respect to his participation in the scheme and his market manipulation, including:

- Bendelac's history of trading at Clinton Greyling's request in other securities. *Compare* BPF ¶¶ 18, 21-26 *with* PF ¶¶ 94-122.

Bendelac's history of trading securities at Clinton Greyling's request involved leveraging Bendelac's unique situation at First Manhattan and control over multiple brokerage accounts in a quid pro quo with the Greylings. *See* PF ¶¶ 94-122. Bendelac knew that coordinated trading was prohibited, *see* Tr. Day 3 (Donelan) at 11:2-10, and that these trades involved suspicious circumstances and requests, *see* PF ¶¶ 117-122, and yet Bendelac willingly placed the orders he was asked to place by Clinton Greyling in order to keep receiving shares from the Greylings at a discount. *See* PF ¶ 110. This supports the inference that Bendelac did the same when asked by Clinton Greyling to make trades in Token stock (with much more culpable knowledge), and more broadly that Bendelac had an interested in continuing to cooperate with the Greylings. *See* PF ¶¶ 94-122, 242-267. Bendelac concludes, without basis, that these arranged trades at artificial prices could not be deceptive to potential secondary market purchasers, BPF ¶¶ 25-26, and he offers no explanation for placing multiple unexecuted bids at Clinton Greyling's request. *See* PF ¶¶ 121-122.

- Bendelac's trading in Millennium Energy Corp. ("Millennium") stock. *Compare* BPF ¶¶ 86-90 *with* PF ¶¶ 179-184.

Bendelac holds out his trading in Millennium stock as evidence of his good faith. *See* BPF ¶¶ 86-90. Bendelac's argument about Millennium seems to be that he never would have placed a manipulative artificial trade in Millennium stock on February 3, 2017 (when he sold 100

10

shares of Millennium stock in Capellini's E*Trade account at $4.50 per share and purchased 100 shares of Millennium stock in Georges Bandelac's Schwab account at $4.50 per share) because in January 2018 (11 months later) he was dumping Millennium stock into the market at much lower prices. If there is a nexus here, it is stretched too far to bear weight.

Although Bendelac's broader trading in Millennium was not the focus of this trial, Bendelac's January 2018 trading in Millennium bears resemblance to his manipulation of Token stock on September 5, 2019 (Trial Exs. 283, 304) in that Bendelac matched orders in multiple accounts and then sold stock to third parties:

On January 2, 2018, Bendelac sold 5,500 shares of Millennium stock in the Aleutian account at $0.42 per share and purchased 2,900 shares of Millennium stock at $0.42 per share in Georges Bandelac's account and 100 shares of Millennium stock at $0.75 per share in Capellini's account. Trial Exs. 166 (Aleutian trade blotter); 178 (Capellini trade blotter); 210 (Georges Bandelac trade blotter).

On January 18, 2018, Bendelac sold 10,000 shares of Millennium stock in the Aleutian account at $0.45 per share, purchased 10,000 shares of Millennium stock in Georges Bandelac's account at $0.45 per share, and purchased 100 shares of Millennium stock in Capellini's account at $0.75 per share. Trial Exs. 166, 178, 210.

In the time period after these matched orders, Bendelac dumped thousands of Millennium shares in the market to third parties. On January 19 and 22, he sold a total of 4,000 shares of Millennium stock in the Aleutian account at $0.45 per share. On January 25, Bendelac sold 2,000 shares of Millennium stock in the Aleutian account at $0.35 per share and purchased 100 shares in Capellini's account at $0.50 per share. On January 29, 2018, Bendelac sold 6,000 shares in the Aleutian account at $0.30 to $0.35 per share. And on January 30, 2018, Bendelac sold 2,500

11

shares in the Aleutian account at $0.30 per share and purchased 500 shares in Capellini's account at $0.33 per share. Trial Exs. 166, 178.

The fact that Bendelac later undertook one kind of manipulation in January 2018 does not undermine the evidence that Bendelac orchestrated a different kind of manipulation for a different purpose in February 2017. These trades are hardly evidence of good faith.

### III. Price Matters, Notwithstanding Bendelac's Unsupported and Illogical "Concept of Volume" Theory.

Bendelac claims that no investors were deceived or could have possibly been deceived by his trading in Token at artificial prices because of the "concept of volume." *See* BPF ¶¶ 79-85; *see also* Tr. Day (Garnache) at 70:10-19; 73:25-74:2; Tr. Day 4 (Jones) at 23:4-8. Volume is a defined term, something that can be measured and reported, and there is no dispute that it is important. The "concept of volume" is an argument by counsel which amounts to the notion that no one cares about price at all if the volume is relatively small. No witness testified at trial that the price of a stock does not matter; certainly not the Trends investors who paid attention to it and did not know it was artificial. *See* Tr. Day 1 (Garnache) at 46:12-19, 51:5-12, 52:4-16, 57:5-58:16, 61:4-9, 61:24-62:18, 67:20-68:4; Tr. Day 2 (Madison) at 56:19-58:7, 61:1-12, 64:20-65:21, 68:4-21, 77:12-78:7; Tr. Day 4 (Jones) at 9:4-10, 12:3-13:1 ("It's really all I looked at was just the share price. I haven't, you know, I'm not a seasoned trader or -- I was just looking at the share price."), 15:16-16:14 ("I thought that was great news. It looked like the stock was going up.").

Counsel's argument presupposes without basis that investors holding a large position would only ever want to sell their entire position at once, and that investors with small positions do not exist. *See, e.g.*, Tr. Day 2 (Madison) at 79:5-14. But Bendelac's sales to Capellini of several hundred or thousands of shares of Token stock created the false appearance that other

investors could *also* sell several hundred or thousands of shares of Token at the same prices. In reality, they could not, unless they similarly arranged for a matched order on the buy-side. Likewise, an investor with a large position might reasonably expect that it would take longer to sell the entire position if there was a lower average daily volume (i.e., a few hundred or thousand shares per day), but not that it would be impossible.

Not only did Bendelac manipulate the price of Token's stock, but he also manipulated its volume. Bendelac's argument that to sell shares in the market there must be a buyer, and therefore Bendelac's trading had no impact, is a non sequitur. *See* BPF ¶¶ 77, 80-85. Bendelac generated volume in Token's stock. PF ¶¶ 202, 207-211. First, his own trades created reported volume. *See id.* For example, Bendelac's trading comprised more than 82% of the total market volume in June 2019 and more than 86% percent of the total market volume in September 2019. Trial Ex. 285. These trades made it look like there were real buyers purchasing Token stock, when it was really Bendelac in another account. *See id.*; PF ¶¶ 202, 207-211. Second, Bendelac's matched orders were followed by third party purchases on multiple occasions. *See, e.g.*, Trial Ex. 290 (purchases at 3:43 p.m. and 3:46 p.m. on February 20, 2019); Trial Ex. 304 (purchases at 2:03 p.m. and 2:39 p.m. on September 5, 2019); Trial Ex. 256 (purchases at 11:44 a.m., 12:50 p.m., and 2:47 p.m. on September 9, 2019); *see also* Tr. Day 3 (Clarke) at 137:17-22 (trading like Bendelac's June 2019 purchases in Capellini's account "typically can" cause a substantial increase in buys placed by other buyers).

**IV.     Bendelac's and Capellini's Matched Trades in Token Stock were Fraudulent.**

As recognized in paragraph 5 of Bendelac's proposed findings, the SEC's complaint alleged that Bendelac's trading in Token stock was intended to induce the purchase of Token

stock by (1) private investors (the Trends investors); and (2) by other investors in the public marketplace. BPF ¶ 5; Complaint ("Compl.") (Dkt. No. 1.) ¶¶ 4, 67.

The SEC's complaint explained the concepts relevant to a pump and dump. Compl. ¶¶ 22-28. The complaint alleged that the Defendants acquired control of a shell company using "various entities controlled by Leslie Greyling, either directly or indirectly through associates, including Trends and Aleutian (Bendelac's entity)." *Id.* ¶ 42. The complaint further alleged that "[t]he purpose of using multiple entities to hold shares was to disguise the common ownership and control so that the 'float' of purportedly unrestricted shares would appear to be held by non-affiliates." *Id.* ¶ 76. And the complaint specifically connected Bendelac's "most active trading in Token" to the April 2019 "news about Token on a financial news website . . . . "—the announcement of the Sakthi merger—which Leslie Greyling shared with Bendelac and Rossetti, noting the "PRESS RELEASE AND 8K." *Id.* ¶ 79; *see* Trial Exs. 104, 105.

There was nothing new, much less "procedurally improper," as Bendelac now claims, *see* BPF ¶ 75, about advancing the theory at trial that Bendelac's trading, most acutely in June 2019, was designed to capitalize on an opportunity to dump his Token shares in the market presented by the anticipated consummation of the Token-Sakthi merger, and the evidence at trial substantiated these allegations. *See* PF ¶¶ 268-312.

Bendelac's and Capellini's supposedly exculpatory explanations for knowingly executing matched trades in the public market of a thinly traded microcap company are not credible. *Compare* BPF ¶¶ 68-77 *and* Defendant Thomas Capellini's Proposed Findings of Fact and Conclusions of Law ("CPF") (Dkt. No. 276) ¶¶ 26-32 *with* PF ¶¶ 268-346.

Perhaps the most telling statement on this point is parroted by both Defendants: if Capellini did not buy from Bendelac, he "would have lost the opportunity to own the promising

14

Token stock at a price that he and Mr. Bendelac deemed fair." BPF ¶ 73; CPF ¶ 30.  The evidence they cite in support of this absurd contention is Capellini's different—but equally absurd—testimony agreeing that it would not make sense for them to sell Token stock "to someone that we don't even know for 50 cents." *See* Tr. Day 3 (Capellini) at 102:23-103:3.  It is also left unexplained how any legitimate opportunity to purchase shares would have been lost to Capellini.  The only trades the Defendants were interested in were those where they set the price and kept the money.

      Bendelac's argument that "real, open market trades that are executed for a legitimate economic purpose rather than with manipulative intent . . . . cannot be the predicate for a Section 17(a)(3) violation" is wrong on the facts and wrong on the law. *See* BPF, Legal Conclusion ¶ 14. The trades here were not real open market trades and did not have a legitimate economic purpose. *See* PF ¶¶ 317-346. They were matched orders, which are illegal. *See* BPF, Legal Conclusion ¶ 2. The question posed in *SEC v. Masri*, cited by Bendelac, is not posed here: whether *real*, *otherwise legal*, open-market transactions (which the court specifically distinguished from matched orders) done with a manipulative intent can constitute market manipulation. *See SEC v. Masri*, 523 F. Supp. 2d 361, 36–73 (S.D.N.Y. 2007). The court in *Masri* addressed only scienter-based violations, and did not discuss Section 17(a)(3) of the Securities Act, much less rewrite the law that a defendant need only be negligent to violate it. *See id.*; *Aaron v. SEC*, 446 U.S. 680, 687 n.5, 695–97 (1980). As the court noted in *Masri,* conduct such as matched orders, "closely resembling fraud, is patently manipulative, serving no purpose other than to transmit false information to the market and artificially affect prices. The defendant's manipulative intent can be inferred from the conduct itself." *Masri*, 523 F. Supp. 2d at 367.

Capellini's story about how much money he was owed by Bendelac also bears the marks of a post hoc contrivance. *See* CPF ¶ 25 (Bendelac owed Capellini "between $35,000 and $40,000"). During his deposition on April 13, 2023, Capellini did not recall how much money he was owed, and admitted that he did not know this information at the time he funded his E*Trade account with $100,000 to purchase Token stock from Bendelac, stating, "Mr. Bendelac managed all of this. I knew we had business expenses – all I knew is that we had business expenses and some monies that were owed to me." Capellini Dep. at 61:23-62:5. Capellini also admitted that he did not invoice or even track his hours worked. *Id.* at 65:17-66:1. No documentary evidence was introduced at trial to corroborate the contemporaneous existence of these expenses or their convenient total. Most importantly, Capellini admitted at trial that he opened the bank account into which the payments from Bendelac were received for the purpose of receiving the trading proceeds from Bendelac. PF ¶ 293. The Defendants' story might provide some thin layer of cover if the origins of the funds were unknown, but it makes little sense here in that Capellini funded the trades and Bendelac was paying Capellini with Capellini's own money. *See* PF ¶¶ 288-296, 303-304.

Bendelac also makes a series of assertions, unsupported by citations to the record, about how his trading with Capellini did not have certain "hallmarks of pump-and-dump trading": round trip trades, wash trades, and price laddering (leaving out other hallmarks such as matched orders, control of the issuer, control of the public float, stock promotions, blocks of shares just under 5%, or deposits of physical share certificates). BPF ¶ 76.

No evidence was introduced at trial which supports the proposition that these are *necessary* conditions of a pump and dump, rather than indicia of a pump and dump which may occur with or without some of these attributes. In any event, Bendelac and Capellini did not need

16

to make "round trip" trades in order to generate the sham trades in Token stock because the money made the return trip instead of the shares, with Bendelac selling to Capellini and then kicking back to Capellini the trading proceeds. The trades between Bendelac and Capellini (placed by Bendelac on both sides) were analogous to wash trades (which involve no real change in beneficial ownership of a stock) in that Bendelac and Capellini were operating as a team. And the evidence at trial established multiple occasions on which Bendelac manipulated the stock price, including his use of price laddering on September 5, 2019. *See* Trial Exs. 289, 290, 303, 304.

      Bendelac claims that this could not have been a pump and dump because neither Bendelac, nor Capellini, nor Clinton Greyling nor Trends actually dumped their shares. BPF ¶ 76.d-e. Bendelac was the only group member who was able to deposit shares of Token stock with a broker because of his unique arrangement at First Manhattan, and so Bendelac was the only group member in a position to dump his Token shares. PF ¶¶ 21, 91-93, 111-116, 123-135, 162-166. Bendelac's opportunity was eviscerated when the Token-Sakthi merger was rescinded and the expected Super 8-K was not filed. *See* PF ¶¶ 305-308. Bendelac's success was limited, but it was not non-existent: He admits that he sold approximately $6,000 of Token stock to other investors in the market. Trial Ex. 269 ¶¶ 31-32. And after Capellini acquired Token shares from Bendelac (thus giving Capellini a motive), Bendelac tried to dump some of Capellini's shares. PF ¶¶ 311-312; Trial Ex. 304 (Bendelac attempted to sell 5,000, and then 3,000, of Capellini's Token shares on September 5, 2019). In any event, the "manipulative conduct does not need to be successful in order to violate the securities laws." *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 60 (S.D.N.Y. 2017).

17

Bendelac and Capellini credit themselves with not selling Token shares during "a period of time after [Capellini] purchased his shares that the shares increased in value." BPF ¶ 76.d; CPF ¶ 31. Bendelac and Capellini are pointing to May, June, and July of 2020. *See* Trial Ex. 261 (price/volume chart for Token stock reflecting higher prices beginning in May 2020, the only dates with prices higher than the price of Capellini's purchases). Assuming that Bendelac and Capellini really could have sold their shares, this was *after* the SEC interviewed Bendelac about the Token stock trading between their accounts. *See* Tr. Day 3 (Donelan) at 7:8-9:18. Because each defendant clearly had engaged counsel at the time, *see* Tr. Day 3 (Brown) at 39:25-40, the SEC does not suggest that the Defendants' decision to hold their Token shares after this point reflects any consciousness of guilt, but it does not reflect its absence, either.

Finally, Trevor Donelan credibly testified that Bendelac lied to the SEC about having access to Capellini's account and about the intentionally matched orders in Token stock. This was powerful evidence of Bendelac's awareness of wrongdoing and his lack of credibility as a witness. Bendelac went so far as to claim that he would have told Capellini not to purchase Token stock if he had known what was happening. PF ¶¶ 101, 313-316.

Bendelac's arguments as to why his lies to the SEC should be minimized, or Donelan's testimony should not be believed, are unavailing. BPF ¶¶ 92-98. Donelan's testimony was based on his first-hand memory of the interview, which he participated in. Tr. Day 3 (Donelan) at 7:8-9:7. Accordingly, neither former SEC paralegal Sheila D'Entremont (who Bendelac did not call to testify) nor her notes (which Bendelac did not offer into evidence) are at issue.

Donelan's memory of the interview was strong. Bendelac's lies about his trading were "particularly salient" to Donelan because the reason the SEC called Bendelac was to ascertain whether Bendelac did the trading in Capellini's account. *Id.* at 23:1-22. It takes no imagination to

18

believe that Bendelac would lie about his trading, because recorded audio of Bendelac calmly lying to E*Trade was played at trial. PF ¶ 102. Bendelac's dishonesty, consciousness of wrongdoing, and failure to provide the explanations he now advances cannot be wished away as a side-effect of the pandemic or by the other theories of absolution he offers. *See* BPF ¶¶ 92-98. Bendelac lied about his actions because he knew his actions were fraudulent and that admitting he was responsible for the trading in Capellini's and Georges Bandelac's accounts would have implicated him in securities fraud and exposed Capellini's substantial assistance. *See* PF ¶¶ 101-103, 313-316.

Dated: December 20, 2024

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

/s/ David M. Scheffler
David M. Scheffler (Mass Bar No.670324)
Nita K. Klunder (Mass Bar No. 689304)
David H. London (Mass. Bar No. 638289)
Boston Regional Office
33 Arch St., 24th Floor, Boston, MA 02110
(617) 573-8810(Scheffler direct)
(617) 573-8822 (Klunder direct)
schefflerd@sec.gov; klunderni@sec.gov; londond@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2024, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

/s/ David M. Scheffler
David M. Scheffler