<table>
<tr><td colspan="2" align="center"><strong>UNITED STATES DISTRICT COURT<br>DISTRICT OF MASSACHUSSETS</strong></td></tr>
<tr><td>SECURITIES AND EXCHANGE COMMISSION<br><br>v.<br><br>TRENDS INVESTMENTS INC., BRANDON ROSSETTI, CLINTON GREYLING, LESLIE GREYLING, ROGER BENDELAC, AND THOMAS CAPELLINI</td><td>Case No. 1:22-cv-10889-RGS</td></tr>
</table>

## ROGER BENDELAC'S RESPONSE TO THE SEC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Roger Bendelac did not violate federal securities laws, and the SEC failed to prove that he did. Clinton Greyling—the "star witness" who was entirely within the SEC's control—threw ice cold water on the theory that the SEC pled in its complaint, which is that Mr. Bendelac participated in a fraud scheme dreamed up and perpetrated by Greyling and Brandon Rossetti.[1] The SEC then concocted a second theory at trial, which is that Mr. Bendelac and Thomas Capellini tried (unsuccessfully) to perpetrate their own independent "pump and dump" of Token stock in June 2019. In addition to departing from the complaint itself, that newfangled "pump and dump" theory was never consistent with the objective trading records and was then completely eviscerated by Mr. Capellini's credible and unimpeached trial testimony. Now, in its proposed statement of facts, the SEC suggests a third theory, which is that Mr. Bendelac and Mr. Capellini attempted a "pump and dump" on September 5, 2019 through a handful of trades that (1) the SEC did not even question

---

[1] In its proposed findings of fact, the SEC seeks to rely on vague, out-of-context, and clearly coached statements that Greyling made during his direct examination, while ignoring that on cross examination Greyling freely admitted that he could not recall a single instance in which he directed Mr. Bendelac to place a trade in Token stock and never told Mr. Bendelac that he was requesting a trade in *any stock* for a manipulative, deceitful, fraudulent, or otherwise improper purpose.

Mr. Bendelac or Mr. Capellini about in their depositions or at trial, and (2) bear zero resemblance to a "pump and dump."

Not only did the SEC fail to prove its case, but Mr. Bendelac satisfied a burden that the law does not actually impose on him—he proved he is *innocent* of the allegations the SEC has smeared him with. The Court already has seen and heard the evidence for itself, and we trust that the Court will render the correct verdict. We therefore do not feel compelled to respond to each and every paragraph of the SEC's bloated, 93-page proposed factual findings. We respectfully submit this memorandum, however, to address briefly a handful of egregious new assertions that the SEC makes in its proposed factual findings.

## I.  The SEC's Unpersuasive Attack on Mr. Capellini's Credibility

The SEC asks the Court to find "not credible" Mr. Capellini's trial testimony that he was not looking to make a quick buck trading Token stock. *See* SEC Proposed Facts, ¶ 310. This is absurd. Mr. Capellini is not a day trader or a swing trader. Mr. Capellini is a long-term investor who was hoping that his investment in Token stock might end up being a homerun far in the future.

The SEC also asks the Court to find "not credible" Mr. Capellini's testimony that he genuinely was interested in owning shares of a high-risk company like Token. *See id.*, ¶ 332. This too is absurd. As Mr. Capellini testified, his retirement account in 2019 had grown to over $1 million. Mr. Capellini's investment in Token represented a small corner of his retirement account that he reserved for high-risk, high-reward investments—a common investment strategy amongst successful investors. Investing in Token also had the benefit of freeing up liquidity for Mr. Capellini and Mr. Bendelac, which they needed to fund their joint consulting business.

Finally, the SEC asks the Court to find "not credible" Mr. Capellini's testimony that he was genuinely interested in the cryptocurrency sector. *See id.*, ¶ 337. The SEC apparently believes

that the only people who genuinely can be interested in cryptocurrency investments are those who are able to explain in detail how the blockchain works.  If the SEC's belief were correct, Bitcoin would not be trading for $100,000 right now.

**II.    The SEC's New Assertions Regarding September 5, 2019 Token Trades**

In its proposed findings of fact, the SEC references a handful of trades that Mr. Bendelac and Mr. Capellini made in Token stock on September 5, 2019.  *See* SEC Proposed Facts, ¶¶ 309-312.  If those trades do not ring a bell with the Court, it is because the SEC at trial did not ask a single question regarding these trades to Mr. Capellini, Mr. Bendelac, or Greyling.[2]  The only trial testimony that the SEC elicited regarding these trades was from its summary witness Maxwell Clarke, whose only role was to create a set of charts based on FINRA trading data.  The only testimony Mr. Clarke could offer was that the trades occurred.  *See* Day 3 Tr., at 123:25-125:24.

Though the SEC decided not to ask a single question about these trades to Mr. Capellini, Mr. Bendelac, or Greyling, the SEC suddenly places great importance on these trades in its proposed findings of fact.  The SEC now asserts that *these trades* show the independent, secondary market "pump and dump" that has become the SEC's Moby Dick in this case.  Setting aside whether the SEC is engaging in improper sandbagging by suddenly proposing *after trial* a theory that it did not clearly pursue *at trial*, its assertion cannot withstand even an ounce of scrutiny.

On September 5, 2019, Mr. Bendelac placed a limit order to sell 8,500 shares of Token stock from his brokerage account at a price of $2 (the exact same price as the prior day's closing price).  *See* Ex. 154, at p. 24; Ex. 304.  At roughly the same time, limit orders to buy a total of

---

[2] Nor did the SEC ask any questions about these trades during Mr. Capellini's, Mr. Bendelac's, or Greyling's depositions prior to trial.

8,600 shares of Token stock were placed from Mr. Capellini's self-directed retirement account.[3]
*See* Ex. 177 (Capellini E-Trade trading records). The first buy order placed from Mr. Capellini's account was for 5,000 shares at $2.01; that order resulted in an executed trade six minutes after it was placed (*i.e.*, Mr. Capellini purchased 5,000 shares from Mr. Bendelac). *Id.* The second buy order placed from Mr. Capellini's account was for 3,500 shares at a price $2.02; twenty minutes after that order was placed, it still had failed to result in an executed trade, notwithstanding that Mr. Bendelac still had 3,500 shares on offer at $2.[4] *Id.* The order was then changed from 3,500 to 2,500 shares;[5] this reduction in size caused the order to result in an executed trade almost immediately (*i.e.*, Mr. Capellini purchased another 2,500 shares from Mr. Bendelac). *Id.* The third buy order placed from Mr. Capellini's account was for 1,100 shares at a price of $2.05.[6] *Id.* This buy order sat on the market unexecuted for approximately three minutes, notwithstanding that Mr.

---

[3] In its proposed findings of fact, the SEC also references two unexecuted *sell orders* (at prices of $1.90 and $1.91) that were placed from Mr. Capellini's self-directed retirement account earlier in the day and then cancelled shortly after they were placed. The SEC did not ask Mr. Capellini or Mr. Bendelac about those sell orders. Thus, the SEC asks the Court merely to speculate about the reason those orders were placed (including whether they were intended to be buy orders that were entered as sell orders by mistake). In any event, if Mr. Bendelac or Mr. Capellini had been trying to artificially inflate the price of Token stock on the secondary market, placing sell orders from Mr. Capellini's account at a price below the prior day's closing price would have been an awfully counterproductive way to go about accomplishing that goal.

[4] Unlike on the NYSE and NASDAQ exchanges, market makers on the OTC exchange do not have any obligation to facilitate the execution of a trade where the bid and the ask overlap. OTC market makers will facilitate the execution of a trade only where the spread between the bid and the ask provide the market maker a sufficient profit for its trade execution services.

[5] In the E-Trade records, this is memorialized as a simultaneous cancellation of the 3,500 share buy order and placement of a 2,500 share buy order, each with the exact same time stamp.

[6] Presumably the intention was to place a buy order for 1,000 shares—rather than 1,100 shares—so as to match the 1,000 shares that Mr. Bendelac still had on offer. Because the SEC did not ask Mr. Bendelac or Mr. Capellini a single question regarding the September 5 trades, however, the record is silent on that (ultimately immaterial) issue.

Bendelac still had 1,000 shares on offer at $2. *Id.* Shortly thereafter, Mr. Bendelac's remaining 1,000 shares—the same 1,000 shares that Mr. Capellini clearly had been trying to buy with his limit order of $2.05—were snapped up by two other market participants, one of which was an institutional market maker. *See* Exs. 256 (FINRA blue sheet data) and 304 (SEC summary chart). What does this sequence of events prove? It proves only that Mr. Capellini was trying to buy Mr. Bendelac's Token shares, just as he had during the several days in mid-June 2019 that the SEC questioned him about at trial. It does not prove any violation of federal securities laws.

It is downright laughable for the SEC to assert that these September 5, 2019 trades are evidence of a "pump and dump"—successful or otherwise—that Mr. Bendelac and Mr. Capellini were trying to perpetrate. These September 5, 2019 trades were the first trades that either Mr. Bendelac or Mr. Capellini had made in Token stock since June 25, 2019. *See* Ex. 256. The trading data described above clearly shows that Mr. Bendelac was trying to sell his 8,500 Token shares *entirely* to Mr. Capellini at a price essentially identical to the prior closing price of $2, not to unwitting third parties seduced by the siren song of a pathetically executed "pump and dump." Notably, Mr. Bendelac sold Token shares on only seven other days after September 5, 2019, and on all but one occasion those shares were sold entirely to Mr. Capellini, who had buy orders on the other side of the market. *See* Exs. 276 (summary chart), 256 and 257 (FINRA blue sheet data), 179 (Capellini trade blotter). This too contradicts the SEC's "pump and dump" theories, which would require the SEC to show that Mr. Bendelac was trying to dump his shares on random secondary market participants.[7]

---

[7] It is also worth noting that, between June 25 and September 5, 2019, shares of Token were traded by other parties (*i.e.*, parties other than Mr. Bendelac and Mr. Capellini) on at least ten different trading days—June 28, July 11, July 15, July 24, July 26, August 20, August 21, August 23, August 28, and August 29. *See* Ex. 256. Every single one of those trades executed at a price of at least $2, and approximately 50% of those trades executed at a price of at least $3. If Mr. Bendelac and

### III.    The SEC's Attempt to Use Rule 404(b) Evidence to Plug the Holes in Its Case

In yet another instance of desperate sandbagging, the SEC asserts in its proposed findings of fact that Mr. Bendelac "manipulat[ed]" the stock of Millenium Energy Corporation on February 3, 2017 in order to "to support [Trends's] raising funds to acquire a shell company." SEC Proposed Facts, ¶¶ 179-184. The SEC's complaint does not pursue a cause of action against Mr. Bendelac with respect to Millenium stock, and so the SEC's references to Millenium are just a Rule 404(b) frolic. And it is a frolic to nowhere. The SEC asked Mr. Bendelac about his February 3, 2017 trades in Millenium during his deposition; Mr. Bendelac testified that he sold the shares because he needed to raise cash. *See* Bendelac Dep. at 122:8-124:6. The SEC did not impeach this testimony during Mr. Bendelac's deposition, and the SEC at trial did not ask any witness any questions about those Millenium trades.

The SEC also asserts that Mr. Bendelac placed "manipulative bids" in Extract to "induce further investments [in Trends] and to give the appearance that prior investments were going to pay off as promised." SEC Proposed Facts, ¶¶ 188-198. This too is Rule 404(b) evidence that leads nowhere. Mr. Bendelac credibly explained during his deposition the reasons he might have placed these bids, *see* Bendelac Dep. at 19:23-191:13, and the SEC chose not to raise these trades with any witness at trial.

The SEC also asserts that Mr. Bendelac "knowingly manufactured" illegitimate trades for Trends and Clinton Greyling in connection with Greyling's brokerage business (*i.e.*, in connection with stocks other than Token). *See* SEC Proposed Facts, ¶ 117-19. Once again, this is Rule 404(b)

---

Mr. Capellini had been plotting to "dump" their Token shares on secondary market participants, they logically would have sold some of their shares into that liquidity. That they did not do so is powerful evidence that the SEC's "pump and dump" accusations are baseless.

evidence that leads nowhere. Clinton Greyling explained in his testimony the legitimate reason for these trades—they were specifically requested by the attorney for the buying entity in order to show that the stock was tradeable, and they had to take place within 30 days under DTC rules and regulations. Day 1 Tr., 91:17-92:21; Day 2 Tr., 30:19-24.

## IV.     The SEC's Assertions Regarding Mr. Bendelac's Acquisition of His Token Shares

The SEC makes several baseless assertions regarding Mr. Bendelac's acquisition of his Token shares. For example, the SEC says that Mr. Bendelac signed a stock purchase agreement reflecting the "fake payment of money for the shares of Frances Munro," SEC Proposed Facts, ¶ 73, and that Mr. Bendelac "knew that the letters from Attorney Albert Grant which Bendelac provided to First Manhattan were sham opinion letters" because Mr. Grant "could not have any record of him making payment." *Id*., ¶ 156. In addition to being mere Rule 404(b) evidence, the SEC's assertions fail to find support in the actual evidentiary record. The evidence shows that Trends did in fact pay for the Aleutian shares on Mr. Bendelac's behalf—the payment was not "fake." Furthermore, the SEC did not even dispute at trial that Mr. Bendelac accepted the shares in exchange for the extinguishment of a $100,000 debt owed to him by Irving Aronson, which was economically equivalent to receiving $100,000 in cash from Mr. Aronson and then immediately using that cash to acquire Mr. Aronson's rights to the shares. Mr. Bendelac credibly testified that he provided Attorney Grant the information regarding the extinguishment of the debt in exchange for the shares. Day 2 Tr., 99:7-100:8. If the SEC had wanted to pursue a new theory of liability based on "sham" opinion letters, it should have used its nationwide subpoena power to call Attorney Grant as a witness at trial (or at least deposed him during discovery).

The SEC also seeks to fault Mr. Bendelac for transferring his excess Token shares to investors who had agreed to acquire those shares from Trends in a private offering. *See* SEC

7

Proposed Facts, ¶¶ 78-81, 123-128.  The SEC did not introduce a shred of evidence that Mr. Bendelac (1) personally gained anything from this transfer, (2) knew that the investors to whom he transferred those Token shares were ordinary folks rather than experienced venture-stage financiers, or (3) knew that Brandon Rosetti had used false or misleading means to promote the private offering to those investors.  In short, Mr. Bendelac's transfer of his excess Token shares is a fact that does not logically advance the SEC's theories of liability against Mr. Bendelac, let alone suffice to prove those theories.

## CONCLUSION

The SEC has put Mr. Bendelac, his wife Suzanne, and his brother-in-law Mr. Capellini through hell and back.  It has done so based on nothing more than wild, illogical speculation and innuendo.  Trial showed that the SEC's case against Mr. Bendelac and Mr. Capellini is an emperor without clothes.  The Court should return a swift verdict for Mr. Bendelac and Mr. Capellini.


Dated: December 20, 2024                         Respectfully submitted,

                                                 /s/ Aaron M. Katz
                                                 Aaron M. Katz
                                                 Keira Zirngibl
                                                 AARON KATZ LAW LLC
                                                 399 Boylston Street, 6th Floor
                                                 Boston, MA 02116
                                                 (617) 915-6305
                                                 akatz@aaronkatzlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2024, a true and correct copy of the foregoing document was filed electronically through the Court's CM/ECF system, and that accordingly the document will be sent electronically to counsel for all parties.

/s/ Aaron M. Katz