UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 22-10889-RGS

SECURITIES AND EXCHANGE COMMISSION

v.

TRENDS INVESTMENTS INC., BRANDON ROSSETTI,
CLINTON GREYLING, LESLIE GREYLING,
ROGER BENDELAC, and THOMAS CAPELLINI

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER AFTER A BENCH TRIAL

January 24, 2025

STEARNS, D.J.

In June of 2022, the Securities and Exchange Commission (SEC) sued Trends Investments Inc. (Trends), Brandon Rossetti, Clinton Greyling, Leslie Greyling, Roger Bendelac, and Thomas Capellini, alleging several counts of securities fraud. Clinton Greyling quickly settled with the SEC, and the court entered a consent judgment against him on September 23, 2022. Trends, Rossetti, and Leslie Greyling defaulted, and the court entered judgment against them on April 25, 2023.

The claims against Bendelac and Capellini proceeded through a lengthy and contentious period of discovery, leading to a four-day bench trial that convened the week of October 15, 2024. The issues to be tried included

whether Bendelac had committed any primary violations of securities law; whether Bendelac had aided and abetted the commission of securities fraud by other individuals; and whether Capellini had aided and abetted the commission of securities fraud by Bendelac. Based on the credible testimony and exhibits offered at trial, the court makes the following findings and rulings.[1]

## FACTUAL FINDINGS

### *The Parties*

1.      Trends was a Delaware company which specialized in brokering reverse mergers.[2]  Greyling Test., Day 1 Tr. [Dkt # 269] at 77-79.

2.      Clinton Greyling was the President and sole owner of Trends. *Id.* at 77, 79-80; *see also* Trial Ex. 111.

3.      Leslie Greyling is Clinton Greyling's father.  Garnache Test., Day 1 Tr. at 56; Donelan Test., Day 3 Tr. [Dkt # 271] at 11.  Leslie Greyling is

---

[1] Following the trial, the parties were invited to submit proposed findings of fact and rulings of law, which they did, and from which the court has benefitted.

[2] A reverse merger occurs when a private company with an active business operation buys a public company that does not have an operating business, effectively enabling the private company to become publicly traded.  Greyling Test., Day 1 Tr. at 77-78.  Trends acted as an intermediary between the private and public companies during these transactions.  *Id.*

domiciled in England and has been banned from trading in securities in the United States.[3]  Brown Test., Day 3 Tr. at 28-29.

4.    Rossetti worked for Trends as an independent contractor. Garnache Test., Day 1 Tr. at 37.  His job was to raise funds from private investors for Trends.  *Id.*; *see also* Greyling Test., Day 1 Tr. at 97-98.

5.    Bendelac was a longtime friend of the Greyling family and often advised Clinton Greyling on business matters.  Greyling Test., Day 1 Tr. at 80-81.  From August of 2017 through October of 2019, Bendelac was a director of Trends.  Trial Exs. 110, 111; *see also* Greyling Test., Day 1 Tr. at 92-93.

6.    Capellini is Bendelac's brother-in-law.  Capellini Test., Day 3 Tr. at 73.  Bendelac served as Capellini's informal investment advisor and had Capellini's permission to trade on his accounts.[4]  *Id.* at 51, 74-75.

---

[3] The United States attempted to extradite Leslie Greyling but failed. Brown Test., Day 3 Tr. at 29.

[4] Bendelac undoubtedly lied to investigators about his access to Capellini's trading accounts during his first interview with the SEC.  The court, however, does not view this lie as evidence of his participation in the purported conspiracy to defraud investors.  Instead, the court finds it more likely than not that Bendelac lied to cover up any potential tax fraud or breach of his reporting duties to First Manhattan.

### *Unsuccessful 2017 Purchase of Alterola*

7.     In early 2017, the Greylings conceived a plan to acquire the public company Alterola Biotech, Inc., and merge it with a private medicinal marijuana chewing gum company.  Greyling Test., Day 1 Tr. at 93-94.  This transaction differed from prior deals because, instead of acting solely as an intermediary, the Greylings intended for Trends (and thus Clinton Greyling) to become the major beneficial owner of Alterola.  *Id.*

8.     Alterola's purchase price was about $300,000.  Trial Ex. 78; *see also* Greyling Test., Day 1 Tr. at 99.  Because the Greylings did not then have $300,000, they asked Rossetti to solicit the requisite funding from investors.  Greyling Test., Day 1 Tr. at 98-99.  Rossetti charged an "extraordinarily high" commission fee for his work – 40% of any funds he raised.  *Id.* at 102; *see also* Trial Ex. 78.

9.     Rossetti represented to investors that he was selling shares that Trends already owned.  Garnache Test., Day 1 Tr. at 49-50; Madison Test., Day 2 Tr. [Dkt # 270] at 55.  Trends, however, did not yet own the shares of Alterola that Rossetti was offering for sale.  Greyling Test., Day 1 Tr. at 101.

10.     Rossetti also represented that he was selling the shares at a substantial discount from their future market price.  Garnache Test., Day 1 Tr. at 46, 48-49; Madison Test., Day 2 Tr. at 59; Jones Test., Day 4 Tr. [Dkt

# 272] at 24; *see also, e.g.*, Trial Exs. 17, 20, 21.  The promised future market price, however, never materialized.

11.    To prove to investors that the Alterola stock was tradeable, Rossetti would occasionally ask Clinton Greyling to "show a trade."  Greyling Test., Day 1 Tr. at 104; *see also id.* at 105.  If he could, Clinton Greyling would make the trade as requested.  *Id.* at 105-106.  If, however, he could not – if, for example, he lacked shares to trade or had no money in his account – he would occasionally ask Bendelac to make the trade instead as a personal favor.  *Id.* at 107.

12.    On prior occasions, when Clinton Greyling asked Bendelac to make a trade, the trade was meant to demonstrate DTC eligibility.[5]  Greyling Test., Day 2 Tr. at 35-36.

13.    Although the Greylings had informed Bendelac that Trends was actively soliciting investments in Alterola, *see* Greyling Test., Day 1 Tr. at 108, Clinton Greyling did not specify that the trade requests were for the purpose of inducing investors to invest in Alterola, *see id.* at 108-109; *see also* Greyling Test., Day 2 Tr. at 35.

---

[5] The Depository Trust Company (DTC) is a quasi-governmental agency that converts physical shares of stock into digital form.  Once physical shares are successfully deposited with DTC, the stock becomes "DTC eligible."  To maintain this eligibility, at least one shareholder must sell at least one share within 30 days of the stock becoming DTC eligible.

14.    Rossetti raised approximately $500,000 from investors, Trial Exs. 73, 272, $200,000 of which was paid directly to him, Trial Ex. 78.[6] Trends wired the remaining $300,000 to an escrow attorney for Alterola in March of 2017.  Trial Exs. 66, 67, 71.  Issues arose in completing the purchase, however, and the deal collapsed shortly thereafter.  Greyling Test., Day 1 Tr. at 111.  Although the Alterola escrow attorney returned all deposited funds to Trends in April of 2017, Trial Exs. 68, 72, Trends did not take any action to reimburse the investors.[7]

### *2017 Purchase of Token*

15.    The Greylings shifted focus after the collapse of the Alterola deal and decided to use the money obtained from investors to acquire a different public shell company: Token Communities Ltd.[8]  Greyling Test., Day 1 Tr. at 119.  To avoid certain reporting rules (and the restrictions on the sale of

---

[6] Rossetti continued to solicit investments after this point, ultimately raising an additional $2.25 million from investors.  *See* Trial Exs. 271, 272.

[7] Clinton Greyling eventually did acquire Alterola in March of 2018. Trial Exs. 69, 70.  He did not, however, transfer any shares to investors until September of 2019 – and even then, the shares were marked as restricted, precluding investors from depositing and selling them.  Trial Exs. 63, 187, 189.

[8] At the time of the purchase, the company was called Pacific Media Group Enterprises, Inc.  The Greylings changed the name to Extract Pharmaceuticals Inc. in April of 2017, and then to Token Communities Ltd. in January of 2018.  For ease of reference and to avoid confusion, the court will refer to the company by its most recent name, Token.

shares which accompanied those rules), they coordinated the transfer of large blocks of stock to various entities controlled by Clinton Greyling and his business associates. *Id.* at 119-120. Aleutian Equity Holdings LLC, a holding company controlled by Bendelac, was one of those entities. *See, e.g.*, Trial Exs. 6, 90.

16. Although the paper trail indicates that Bendelac (through Aleutian) paid $2,000 to Frances Munro for 100,000 shares in Token, Clinton Greyling credibly testified that he – and not Bendelac – funded the entire transaction. *Compare* Trial Exs. 90, 302; Greyling Test., Day 1 Tr. at 121, 124-125, *with* Greyling Test., Day 1 Tr. at 125.

17. Bendelac testified that the shares were a reimbursement of a $100,000 payment he had made to satisfy the debt of one of Clinton Greyling's business associates, Irving Aronson. Bendelac Test., Day 2 Tr. at 87, 89; *see also* Trial Exs. 115, 299, 300. He considered the $100,000 a loss at the time, however, and any amount earned from the shares "would be gravy at that point." Bendelac Test., Day 2 Tr. at 85.

18. In August of 2017, Bendelac became a director of Trends, Trial Ex. 100, and executed a 54 to 1 forward split of his shares in Token, Trial Ex. 3 at 8. Several months later, at Clinton Greyling's direction, he transferred 5.1 million of his now 5.4 million shares to Trends investors. Trial Ex. 3 at

32-33; *see also* Trial Ex. 11.  Bendelac did not know and had never met any of the investors to whom he transferred shares.  Garnache Test., Day 1 Tr. at 67; Madison Test., Day 2 Tr. at 59; Jones Test., Day 4 Tr. at 24.

### Unsuccessful Sakthi Merger

19.    In early 2019, the Greylings brought Token current in its SEC filings.[9]  They then concocted a plan to merge Token with the Sakthi Group, a well-established company based in India that appeared to have significant capital resources.  Greyling Test., Day 2 Tr. at 9-12.

20.    Rossetti touted the potential merger to investors in April of 2019.  Trial Exs. 56, 57, 61.  The merger, however, ultimately fell through in June of 2019.  Greyling Test., Day 2 Tr. at 11, 14-16.

21.    Following the failed merger, Token again became delinquent in its SEC filings, further preventing investors from depositing shares in digital form.  Greyling Test., Day 2 Tr. at 17-18.

### Trading in Token

22.    Bendelac owned a brokerage account in the name of Aleutian at First Manhattan Co.  Bendelac Test., Day 2 Tr. at 93.  His wife, a compliance director at the firm, was the registered representative on the account.  *Id.*

---

[9] Trends had previously stopped filing periodic reports for Token beginning with the period ending June 30, 2018

23.    Although, as the spouse of an employee, Bendelac was required to report *all* trading (including trades made through other firms) to First Manhattan, he often traded in Capellini's E*Trade accounts and his brother's Charles Schwab & Co. account without notifying his wife or First Manhattan.

24.    On December 18, 2017, Rossetti told an investor that "[w]e are going to see a bid price of a [sic] 1 dollar any min now." Trial Ex. 127. On December 20, 21, and 27, 2017, Bendelac placed bids for 500 shares of Token stock at $1.00 in Capellini's account. Trial Ex. 281. These bids each expired at the end of the day without executing. *Id.*

25.    On January 5, 2018, Bendelac again placed a bid for 100 shares of Token stock at $1.00 in Capellini's account. *Id.* This bid remained open and unexecuted until January 19, when Bendelac cancelled it and submitted a new bid for 500 shares of Token stock at $1.00. *Id.* The January 19 bid remained open and unexecuted until March 3, 2018, when it was cancelled by Bendelac. *Id.*

26.    In September of 2018, Bendelac deposited 300,000 shares of Token stock into his Aleutian account at First Manhattan. Trial Ex. 157. He supported the deposit with a sham legal opinion stating that he had paid for the shares himself and that the shares were not affiliated with Token ownership. *Id.*

27.    Although First Manhattan has certain regulatory obligations and requires its employees to inquire into the source of any large blocks of low-priced securities deposited by a customer, Trial Exs. 158, 161, Bendelac's wife appears to have approved the deposit without conducting due diligence into the source of the shares, Trial Ex. 157; Brown Test., Day 3 Tr. at 32; *see also* Trial Exs. 95, 97.

28.    Trends' investors were unable to deposit their shares at the time, both because they lacked the proper paper lineage (the shares had come from Bendelac rather than Trends), Trial Exs. 41, 47, and because many market makers were unwilling to accept deposits of cryptocurrency-related stocks, Greyling Test., Day 1 Tr. at 89-90, 134.

29.    On September 26, 2018, Bendelac sold 100 Token shares at $1.40.  Trial Ex. 276.  Two days later, he sold another 500 shares at the same price.  *Id.*

30.    In the following months, Bendelac executed the following transactions in Token stock:

    a.    On November 7, 2018, he sold 500 shares of Token stock at $1.60.  *Id.*  Greyling bought 100 of these shares.  *Id.*

    b.    On February 19, 2019, he sold 100 shares of Token stock to himself (acting through Capellini's account) at $2.05.  *Id.*

10

c.      On February 20, 2019, he sold 200 shares of Token stock at $2.00 and, through his brother's account, bought 100 shares at a price of $2.25.  *Id.*

d.      On April 4, 2019 (just as Rossetti began to tout the Sakthi merger to investors), Bendelac sold the 100 Token shares in Capellini's account at a price of $2.50.  *Id.*

e.      On April 9, 2019, Bendelac sold 500 shares of Token stock at $3.78.  *Id.*  Greyling also bought 10 shares of Token stock at $3.45 the same day.  *Id.*

f.      On April 11, 2019, Bendelac sold 200 shares of Token stock at $3.15.  *Id.*  Greyling also bought 10 shares of Token stock at $4.15 the same day.  *Id.*

g.      On April 16, 2019, Bendelac sold 100 shares of Token stock at $3.00.  *Id.*  Greyling also bought 100 shares of Token stock at $3.50 the same day.  *Id.*

h.      On April 17, 2019, Bendelac sold 200 shares of Token stock at $2.80.  Greyling also bought 90 shares of Token stock in four separate transactions (60 shares at $3.05 and 30 at $3.00).  *Id.*

i.      On April 22, 2019, Bendelac sold 400 shares of Token stock at $3.06 and, through his brother's account, bought 100 shares of

Token stock at $3.25 and 200 at $3.00. *Id.* Two days later, he bought another 100 shares at $3.00 in his brother's account. *Id.*

j.    On May 10, 2019, Bendelac sold 100 shares of Token stock at $3.25. *Id.* Greyling also bought 100 shares at $3.00 the same day, and Rossetti bought 130 shares in five separate transactions (70 shares at $3.25 and 60 at $3.50). *Id.*

k.    On May 20, 2019, Bendelac sold 300 shares of Token stock to himself (acting through his brother's account) at $3.01. *Id.*

l.    On May 21, 2019, Bendelac sold 314 shares of Token stock at $4.20. *Id.* That same day, in fourteen separate transactions ranging in value from $2.50 per share to $4.20, Rossetti bought 800 shares and sold 200 shares. *Id.* A day later, in four separate transactions, Rossetti bought a further 120 shares at $4.20. *Id.*

m.    On May 23, 2019, Bendelac sold 300 shares of Token stock at $4.00. *Id.* Rossetti purchased 250 of these shares in three separate transactions. *Id.*

n.    On May 24, 2019, Bendelac sold 386 shares of Token stock at $4.12. *Id.* That same day, in twelve separate transactions ranging from $3.00 to $4.30, Rossetti bought 360 shares and sold 1 share. *Id.*

o.    On June 11, 2019, Bendelac sold 400 shares of Token stock at $4.54, and, through Capellini's account, bought 100 shares at $4.40, 100 shares at $4.50, and 300 shares at $4.54. *Id.*

p.    On June 12, 2019, Bendelac sold 1,000 shares of Token stock at $4.26 and, through Capellini's account, bought 600 shares at $4.25 and 400 shares at $4.28. *Id.*

q.    On June 13, 2019, Bendelac sold 1,513 shares of Token stock at $4.27 and, through Capellini's account, bought 500 shares at $4.26 and 1,000 shares at $4.27. *Id.*

r.    On June 14, 2019, Bendelac sold 2,000 shares of Token stock to himself (through Capellini's account) at $4.25. *Id.*

s.    On June 17, 2019, Bendelac sold 1,000 shares of Token stock at $4.25 and, through Capellini's account, bought 1,100 shares at that same price. *Id.*

t.    On June 19, 2019, Bendelac sold 2,000 shares of Token stock at $4.26 and, through Capellini's account, bought 100 shares at $4.25 and 1,900 shares at $4.26. *Id.*

u.    On June 25, 2019, Bendelac sold 240 shares of Token stock at $4.68. *Id.* Rossetti also bought 140 shares at $4.80 the same day. *Id.*

13

v.      On September 5, 2019 (long after the Sakthi merger had fallen apart), Bendelac sold 8,500 shares of Token stock at $2.02 and, through Capellini's account, bought 5,000 shares at $2.01, 2,500 shares at $2.02, and 600 shares at $2.03. *Id.*

w.      On September 9, 2019, Bendelac sold 2,000 shares of Token stock at $2.54 and, through Capellini's account, bought 100 shares at $2.50, 900 shares at $2.52, and 1,000 shares at $2.55. *Id.*

x.      On October 10, 2019, Bendelac, through Capellini's account, bought 189 shares of Token stock at $2.51. *Id.*

y.      On October 18, 2019, Bendelac sold 2,500 shares of Token stock to himself (acting through Capellini's account) at $2.53. *Id.*

z.      On November 12, 2019, Bendelac sold 3,000 shares of Token stock at $2.61. *Id.*

aa.     On November 13, 2019, Bendelac sold 1,000 shares of Token stock to himself (acting through Capellini's account) at $2.54. *Id.*

bb.     On December 2, 2019, Bendelac sold 1,930 shares of Token stock at $2.00 and, through Capellini's account, bought 1,711 shares at $2.00 and 1,100 shares at $2.01. *Id.*

cc.    On December 3, 2019, Bendelac, through Capellini's account, bought 1,000 shares of Token stock at $2.00. *Id.*

dd.    On March 17, 2020, Bendelac sold 2,500 shares of Token stock to himself (acting through Capellini's account) at $1.52. *Id.*

ee.    On March 18, 2020, Bendelac sold 2,475 shares of Token stock at $1.51 and, through Capellini's account, bought 200 shares at $1.50 and 2,300 shares at $1.51. *Id.*

ff.    On April 8, 2029, Bendelac, through Capellini's account, bought 100 shares of Token stock at $1.00. *Id.*

gg.    On April 16, 2020, Bendelac, through Capellini's account, bought 100 shares of Token stock at $1.00. *Id.*

31.    Clinton Greyling testified that, apart from a few occasions in which he merely asked Bendelac to make a trade (without explaining why), he did not direct Bendelac's trading in Token stock. Greyling Test., Day 2 Tr. at 9, 34-35. The phone and Skype records are consistent with his testimony.[10] *See* Trial Ex. 282.

---

[10] Many of the trades occurred on days in which Clinton Greyling and Bendelac did not exchange any text messages or phone calls. *See* Trial Ex. 282. And even when phone calls *did* occur on the same day as a trade, they often occurred after market hours and lasted mere seconds, indicating that the calls went unanswered. *See id.*

32.    The nature of the transactions themselves further supports Greyling's testimony.   Most of the trades involved Bendelac selling a (relatively small) quantity of shares at a certain price point and, on the same day, purchasing a similar quantity in Capellini's (or his brother's) account for a similar price.   Only on a few occasions did Clinton Greyling or Brandon Rossetti buy Token shares on the same day that Bendelac sold shares, and when they did, it was often at different prices and quantities.

33.    Capellini credibly testified that, in 2019, he was experiencing liquidity problems and was behind on his bills.   Capellini Test., Day 3 Tr. at 76-78, 80.   Bendelac owed Capellini between $35,000 and $40,000 for expenses incurred in connection with a joint business venture but could not reimburse Capellini at that time because he, too, was experiencing liquidity problems.   *Id.* at 80; *see also* Trial Ex. 270.

34.    To generate liquidity, Bendelac came up with a plan to effectively withdraw money from Capellini's retirement account without triggering a tax penalty.[11]   The plan was as follows: (1) Capellini would roll $100,000 over from his 401(k) into a (newly-created) self-directed IRA account that allowed for trading in individual stocks, including stocks trading on the over-the-

---

[11] The legality of this scheme as a matter of tax law is not currently before the court.

16

counter market; and (2) Capellini would then use the IRA account to purchase shares of Token stock from Bendelac in an arranged trade. This would essentially transfer cash from Capellini's retirement account to Bendelac's brokerage account, which Bendelac could then use to pay the $35,000 to $40,000 owed to Capellini. Capellini Test., Day 3 Tr. at 81-83.

35.    By using dozens of small transactions, Bendelac and Capellini minimized the risk that any buy order in Capellini's account would accidentally be fulfilled by a different seller (meaning that the funds from the sale would not be deposited into Bendelac's account).

36.    Capellini testified that he and Bendelac chose to trade in Token stock because he had an interest in blockchain and cryptocurrency. Capellini Test., Day 3 Tr. at 96. The court finds it more likely than not, however, that Token stock was used because of its illiquidity. Fewer buyers and sellers meant that it was easier to ensure that Bendelac would be the seller for Capellini's purchases.[12]

---

[12] That the potential consequence of illiquidity was a lost investment did not factor in the plan because Bendelac had not paid for his shares in the first instance (and already considered the $100,000 debt from Aronson a loss at the time he received his shares, *see* Bendelac Test., Day 2 Tr. at 85).

## RULINGS OF LAW

### Sections 17(a)(1) and 10(b)

1.  Section 17(a)(1) of the Securities Act, 15 U.S.C. §§ 77a *et seq.*, prohibits "any person in the offer or sale of securities" from directly or indirectly "employ[ing] any device, scheme, or artifice to defraud." *Id.* § 77q(a)(1).

2.  Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78a *et seq.*, and its cognate Rules 10b-5(a) and (c) similarly prohibit any person from "employ[ing] any device, scheme, or artifice to defraud," or "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of a security. 17 C.F.R. §§ 240.10b-5(a), (c); *see also* 15 U.S.C. § 78j(b).

3.  "The elements of an action for securities fraud under Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder) and Section 17(a)(1) of the Securities Act are substantially the same under the Supreme Court's precedents." *SEC v. Sharp*, 626 F. Supp. 3d 345, 389 (D. Mass. 2022), quoting *SEC v. Tambone*, 417 F. Supp. 2d 127, 131 (D. Mass. 2006). Liability under both causes of action requires scienter. *See Flannery v. SEC*, 810 F.3d 1, 9 (1st Cir. 2015).

4.     To establish scienter, a plaintiff must show that the defendant consciously intended to defraud or acted with a high degree of recklessness. *See SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir. 2008).  "Recklessness is 'a highly unreasonable omission, involving not merely simple, or even inexcusable[ ] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'"  *Id.* at 47-48, quoting *SEC v. Fife*, 311 F.3d 1, 9-10 (1st Cir. 2002).

**Section 17(a)(3)**

5.     Section 17(a)(3) of the Securities Act prohibits "any person in the offer or sale of securities" from directly or indirectly "engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a)(3).

6.     "[T]he language of § 17(a)(3) . . . quite plainly focuses upon the *effect* of particular conduct on members of the investing public, rather than upon the culpability of the person responsible." *Aaron v. SEC*, 446 U.S. 680, 696-697 (1980) (emphasis in original).  Negligence thus is sufficient to establish liability under this provision. *See Ficken*, 546 F.3d at 52.

**Section 9(a)(2)**

7.    Section 9(a)(2) of the Exchange Act prohibits any person from "effect[ing] . . . a series of transactions in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."  15 U.S.C.§ 78i(a)(2).

8.    Section 9(a)(2) requires "proof of specific intent or purpose to induce others to trade in a security."  *SEC v. Wallace*, 2017 WL 8230026, at *4 (C.D. Cal. May 8, 2017).

**Aiding and Abetting**

9.    "To establish aiding and abetting liability, a plaintiff must establish: 1) a primary violation was committed, 2) the defendants had a general awareness that their conduct was a part of an overall activity that was improper and 3) the defendants knowingly and substantially assisted in the primary violation."  *Tambone*, 417 F. Supp. 2d at 136; *see also SEC v. Durgarian*, 477 F. Supp. 2d 342, 357 (D. Mass. 2007).

## ULTIMATE FINDINGS OF FACT AND RULINGS OF LAW

## Sections 17(a)(1), 9(a)(2), and 10(b)

1.    Days after Rossetti told an investor that "[w]e are going to see a bid price of a [sic] 1 dollar any min now," Trial Ex. 127, Bendelac placed a series of $1 bids on Token stock, none of which were executed.

2.    It is more likely than not that these bids were placed at Clinton Greyling's behest.

    a.    In his subsequent trading history, Bendelac only used the Aleutian account to sell – not buy – Token stock.

    b.    The bids occurred around the same time that Bendelac transferred hundreds of thousands of Token shares to investors whom he had never met, acting at Clinton Greyling's instruction.

3.    As a director of Trends from August of 2017 through October of 2019, Bendelac knew or should have known that Trends was soliciting investments from investors at the time he placed these bids.

4.    The SEC has not proven by a preponderance of the evidence, however, that Bendelac knew or should have known that Rossetti would use these bids to induce those investments.

a.  There is no evidence that Greyling told Bendelac the bids would be used to induce investments, and there are other plausible reasons for the request which would not entail defrauding investors.

b.  Bendelac did not know and had never met Rossetti, Trends' main point of contact with investors.

5.  In addition to placing bids, Bendelac made dozens of trades in Token stock between September of 2018 and April of 2020.

6.  As a director of Trends from August of 2017 through October of 2019, Bendelac knew or should have known that Trends was soliciting investments from investors at the time he made these trades.

7.  The SEC has not proven by a preponderance of the evidence, however, that Bendelac knew or had reason to know that his trades were being used by Trends to induce those investments.

a.  As noted above, Bendelac did not know and had never met Rossetti.

b.  Most of Bendelac's trades were made in furtherance of a different (perhaps sketchy) scheme: to withdraw money from Capellini's retirement account without incurring a tax penalty.

c.  Clinton Greyling testified that, on the few occasions that Bendelac *did* trade in Token stock at his request, he did not explain to

Bendelac the reason for the request. As Clinton Greyling's prior requests to Bendelac to show a trade were always for the purposes of proving DTC eligibility, the court does not draw any inference of knowledge from the impropriety of the request alone.

d.    Bendelac did not know and had never met any of the investors directly. At best, he learned their names when he transferred stock to them at Clinton Greyling's behest – but even then, there is no indication he knew or should have known what information was used to induce their investments in the first instance.

8.    In the absence of sufficient evidence to establish scienter, the SEC has not met its burden of proving by a preponderance of the evidence that Bendelac knowingly or recklessly employed any device, scheme, or artifice to defraud Trends' investors in violation of Section 17(a)(1) of the Securities Act or Section 10(b) of the Exchange Act.

9.    The SEC also has not met its burden of proving by a preponderance of the evidence that Bendelac acted "for the purpose of inducing the purchase or sale of such security by others" in violation of Section 9(a)(2) of the Exchange Act.

**Section 17(a)(3)**

10.    The SEC has not proven by a preponderance of the evidence that Bendelac was negligent as to the risk of defrauding investors in violation of Section 17(a)(3).

a.    Bendelac traded in relatively small amounts of Token stock – a mere fraction of the amount of stock each shareholder held.

b.    The court credits his explanation that the trades were not placed with any manipulative intent.  Instead, they were meant to free up money in his Aleutian account for credit card and bill payments.

c.    For the reasons explained above, the SEC has not shown that Bendelac knew or should have known that Rossetti was using these trades to induce investments.

**Aiding and Abetting**

11.    The SEC has not met its burden of showing that Bendelac had any awareness that his conduct was part of the concerted and improper scheme alleged in its Complaint or that he knowingly and substantially assisted in any of the alleged violations of the securities laws (whatever other perhaps improper purpose he meant to pursue).

12.    The SEC thus has not proven by a preponderance of the evidence that Bendelac aided and abetted the alleged securities fraud.

24

13.    The SEC has not met its burden of showing Bendelac committed any primary violation of securities law or, for aiding and abetting purposes, that Capellini had any awareness that his conduct was part of any concerted and improper scheme alleged in its Complaint or knowingly and substantially assisted in any alleged violation of the securities laws.

14.    The SEC thus has not proven by a preponderance of the evidence that Capellini aided and abetted the commission of securities fraud.

## ORDER

The parties will submit proposed forms of judgment consistent with the court's findings and rulings within fourteen (14) days of the entry of this opinion.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE