UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>                    **Plaintiff,**<br>    v.<br>**TRENDS INVESTMENTS INC., BRANDON ROSSETTI, CLINTON GREYLING, LESLIE GREYLING, ROGER BENDELAC, and THOMAS CAPELLINI**<br>                    **Defendants.** | Civil Action No. 1:22-CV-10889-RGS |

### SEC'S OPPOSITION TO DEFENDANT BENDELAC'S MOTION FOR ATTORNEYS' FEES AND EXPENSES

On February 18, 2025, Defendant Roger Bendelac filed a timely motion seeking an award of attorneys' fees and litigation-related expenses pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. 2412. Bendelac's memorandum in support of this motion argues that he is entitled to an award because the litigation position of the United States Securities and Exchange Commission ("SEC" or "Commission") in the underlying enforcement matter was not "substantially justified" under Section 2412(d)(1)(A). Bendelac specifically states that the Commission's case was not substantially justified after the deposition of Clinton Greyling on September 4, 2024. Bendelac's motion seeks an award of $134,250 for attorneys' fees and $5,311 for expenses.

Bendelac's motion to recover EAJA fees should be denied. Under EAJA, prevailing parties cannot recover fees against a governmental agency whose litigation position in the underlying matter was "substantially justified," and the Commission's litigation position was substantially justified. Although this Court granted judgment in Bendelac's favor, the Commission's litigation position against Bendelac had a solid legal and evidentiary

1

foundation both before and after Greyling's deposition. Indeed, Bendelac vastly overstates the impact of Greyling's deposition.

## FACTUAL BACKGROUND

On June 9, 2022, the Commission commenced this action against six Defendants. The Commission's Complaint alleged that four of the Defendants (Trends Investments, Inc. and its personnel, Clinton Greyling, Leslie Greyling, and Brandon Rossetti) engaged in a scheme to defraud investors in private offerings and sales of shares of two publicly traded companies. Clinton Greyling ("Greyling")[1] was the President and owner of Trends, a firm that specialized in brokering reverse mergers. The Complaint further alleged that Roger Bendelac, a director of Trends, participated in the scheme by placing sales through accounts he controlled to create the false appearance of active trading in, and inflate the price of, the stock of Token Communities Ltd. ("Token") to induce public market stock purchases. Finally, the Complaint alleged that Bendelac violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder, as well as aided and abetted violations of Section 17(a)(1) and (3), and Section 10(b) and Rule 10b-5(a) and (c) by others.

The matter was resolved against Trends Investments, Leslie Greyling, Clinton Greyling, and Rossetti prior to trial.[2] Bendelac filed a series of dispositive motions challenging the Commission action; each was denied by this Court.

The case against Bendelac and Thomas Capellini ("Capellini") was tried before this Court over four days beginning on October 15, 2024 and concluding on October 18, 2024. On

---

[1]   Unless otherwise indicated, refences to "Greyling" will refer to Clinton Greyling.

[2]   This Court entered a consent judgment against Clinton Greyling on September 23, 2022. Default judgments were entered against Trends, Leslie Greyling, and Rossetti on April 25, 2023.

January 24, 2025, this Court issued its Findings of Fact, Rulings of Law, and Order After a Bench Trial, and entered judgment in favor of Bendelac and Capellini.[3]

## ARGUMENT

**I.    The Commission's Litigation Position Was Substantially Justified.**

EAJA is not an automatic fee shifting statute. It does not permit the award of fees to an eligible party who prevailed in litigation with the government if the government's position was "substantially justified."[4] *See* 28 U.S.C. § 2412(d)(1)(A) ("a court shall award to a prevailing party ... fees and other expenses ... incurred by that party in any civil action ... brought by or against the United States ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust").

The "substantially justified" standard is satisfied when the government has a "reasonable basis both in law and fact" for its position. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988); *Michel v. Mayorkas*, 68 F.4th 74, 78 (1st Cir. 2023). A position "can be justified even though it is not correct, and we believe it can be substantially (*i.e.*, for the most part) justified if a reasonable person could think [the government's position] correct." *Pierce,* 487 U.S. at 566, n.2. *See also Dantran, Inc. v. United States DOL*, 246 F.3d 36, 41 (1st Cir. 2001) (the government's case "need not be a cliffhanger to be substantially justified"). In order to meet this standard, the government's position does not need to be "justified to a high degree." *Pierce*, 487 U.S. at 565; *Saysana v. Gillen*, 614 F.3d 1, 5 (1st Cir. 2010). *Michel*, 68 F.4th at 18. Rather, the government satisfies the standard "if its position is justified in substance or in

---

[3]    Capellini has filed a separate EAJA application.

[4]    *See* H.R. Rep. No. 1418, 96th Cong. 2d Sess. (1980), *reprinted in* U.S. Code Cong. & Admin. News 4984, 4990 (SER 73) ("The standard … should not be read to raise a presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the government to establish that its decision to litigate was based on a substantial probability of prevailing.").

3

the main." *Michel*, 68 F.4th at 78 (quoting *Saysana*, 614 F.3d at 5). "[E]ven if the government failed on the merits, its position could still have been substantially justified." *Id*. (citing *Aronov v. Napolitano*, 562 F.3d 84, 94 (1st Cir. 2009)).

EAJA waives the government's sovereign immunity "'and so must be construed strictly in favor of the government.'" *Michel*, 68 F.4th at 78 (quoting *Scarborough v. Principi*, 541 U.S. 401, 407 (2004)).

Any evaluation of the reasonableness of the Commission's claims must recognize that a strong public interest dictates that the SEC vigorously enforce the federal securities laws. *See SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 809 n.5 (2d Cir. 1975) ("since the SEC seeks to vindicate the public interest, the need to enforce the securities laws must be given special emphasis in the district court's calculation").

### A.  The Commission Had a Reasonable Legal and Factual Basis for Pursuing its Claims Against Bendelac.

The Commission's claims against Bendelac were based on evidence developed during the investigation of transactions involving Trends, a holding company owned and controlled by Greyling that specialized in arranging reverse mergers. Greyling Dep. at 30:6-31:5. Bendelac was a long-time acquaintance of both Greyling and his father, Leslie Greyling. Greyling Dep. at 36:9-24.

In 2017, Greyling asked Bendelac to assist Trends' effort to purchase Alterola Biotech, Inc. ("Alterola"), a public shell company purportedly developing medicinal chewing gum. Greyling Dep. at 53:6-13; Tr. Day 1 (Greyling) at 93:17-94:20. Greyling planned to solicit investors to finance the purchase of Alterola, merge it into another operating business, and profit by selling the stock to investors in the market while maintaining ownership of the company. Tr. Day 1 (Greyling) at 94:3-20.

4

By late March 2017, the deal to purchase the Alterola shell had fallen through. PFF ¶53.[5] The following month, the Greylings pivoted to acquiring a replacement shell (a company initially called Pacific Media Group Enterprises, Inc. and ultimately known as Token Communities Ltd. (referred to hereafter as "Token")).  PFF ¶¶56-58. Bendelac considered this to be a "significant" deal and knew the Token deal was different than the Greylings' reverse merger deals from prior years. PFF ¶¶59-60.

While Trends was pursuing this deal, Bendelac became a director at Trends, and he served in that position from August 2017 through October 2019. PFF ¶¶ 1, 173. Bendelac joined the Token scheme, in part, as a means to recoup $100,000 owed to him by Irving Aronson (an associate of Greyling) who he believed had previously engaged in a "scam" and "screwed" one of his associates. PFF ¶¶28-32; Tr. Day. 2 (Bendelac) at 84:17-85:21. Bendelac was aware when he joined the Token scheme that Greyling planned to utilize a stock promotion to increase the acquired company's stock price and trading volume. PFF ¶¶33, 88-89, 282.

Bendelac performed many functions in furtherance of Greyling's deals, including introducing Greyling to investor relations firms, accountants, attorneys, fund managers, and brokerage firms. Tr. Day 1 (Greyling) at 83:6-85:1. His most significant contribution was an arrangement with a brokerage firm, First Manhattan, that allowed him to circumvent regulatory requirements governing the stock sales of company insiders. Tr. Day 1 (Greyling) 85:5-10; 133:16-134:22, Tr. Day 2 (Greyling) at 6:25-7:10. Bendelac's wife was a compliance officer at the brokerage firm and was the registered representative on the account Bendelac

---

[5]     The Commission incorporates by reference its Proposed Findings of Fact and Law ("PFF"), Docket Entry ("Dkt. No.") 275, as a summarization of the evidence gathered during the investigation that led to the filing of the Complaint and as further support for the Commission's position that including Bendelac as defendant in this action was substantially justified.

controlled; she allowed Bendelac to deposit physical share certificates into the account without inquiring into how the shares were acquired. Tr. Day 1 (Greyling) at 85:5-10; 133:16-134:22. [6] This enabled Bendelac to avoid the requirement that he provide information as to the source, ownership, payment for, and trading history of shares, which Greyling agreed was helpful in moving the deal forward. Tr. Day 1 (Greyling) at 133:9-134:25; *see also* Trial Ex. 95 (Bendelac email to Greyling stating that he had "zero scrutiny on CERTS … I need to make no payments as I need no proof of payments. Just the Certificate"). Bendelac confirmed in an interview with the FBI that First Manhattan did not conduct any due diligence review of his deposits into his account. Tr. Day 3 (Brown) at 32:11-16.

With respect to the Token transaction specifically, the Greylings, Bendelac, and the others in the group acquired large blocks of stock in Token and thereby controlled when to sell the stock into the market. PFF ¶¶61-65. Clinton Greyling structured the transaction according to the "5% rule," meaning that the group members, including Bendelac, received blocks of shares totaling just under 5% of the company's stock so as to make it appear that the shares were being distributed to unaffiliated investors rather than to a control group. PFF ¶¶66, 68. As a result, Bendelac and the others were able to avoid being subject to both the 5% rule reporting requirements and, more importantly, the restrictions on sales of stock that come with being part of a control group. PFF ¶69. Bendelac was aware of the 5% rule because, as Clinton Greyling testified, Bendelac "had helped [Greyling] get legal opinions for public company stock before and, therefore would know … yes." PFF ¶67.

---

[6] Bendelac knew that he was required to report all trading to First Manhattan (including trades through other firms). Nevertheless, he made trades through accounts at other brokers held by his brother and his wife's brother (Capellini) without informing First Manhattan or his wife. Court Findings, ¶23.

In early 2018, at the Greylings' instruction, Bendelac transferred 5 million of his 5.4 million Token shares to various Trends investors. PFF ¶¶78-79. Trends continued to solicit investments in both Token and Alterola from the pool of new and existing private investors through July 2019. PFF ¶86. Ultimately, the Trends investors could not deposit their shares with a broker or sell their shares in public securities markets, but Bendelac was able to deposit and sell his Token shares. PFF ¶¶91-93.

Bendelac, Greyling, and Rossetti arranged "improper" and "artificial" public market trades in Token stock that served no legitimate purpose and helped Trends by making it appear to investors that there was a market for their investments in Token stock. PFF ¶¶204-206. Bendelac's trades in Token stock created a false appearance that Token's stock was being actively traded when his own trades comprised a large portion of stocks being traded. PFF ¶207. In February 2019, Bendelac and Greyling both made purchases of stock on the same day. PFF ¶216. Bendelac made these trades with the knowledge that Greyling "was concerned with the price" of Token's stock. Bendelac Dep. 198:9-199:1.

As the Court found, these facts provided evidence that Bendelac knew that Trends was soliciting investments at the time he was bidding on and trading in Token stock. Court's Ultimate Findings, ¶¶3, 6. He took advantage of First Manhattan's lack of scrutiny to deposit shares of Token he had never paid for, supported by a sham legal opinion, and he also knew that his trading outside the firm violated the firm's requirements. While the Court found that the SEC had not proven that Bendelac knew that his bids and trades would be used to induce investments or otherwise further violations of the federal securities laws, the SEC provided a basis for such a finding. For example, based on the evidence, the Court might have found that Bendelac's awareness of the private sales to Trends' investors, coupled with the requests from Greyling to "show a trade" in Token stock without any legitimate explanation, reflected Bendelac's awareness that Greyling was using the trades to further a fraudulent or

7

manipulative scheme. Similarly, the evidence of Bendelac's trading over the relevant period and on particular occasions (e.g, February 19-20, 2019) provided substantial justification for the SEC's argument that Bendelac was inflating the reported market price for Token stock with an eye towards selling his own shares into the market when he had the opportunity. Finally, although the Court inferred from the evidence that Bendelac more likely than not lied to the SEC to cover up any potential tax fraud or breach of his reporting duties, the Court might have found that he lied to conceal the alleged securities laws violations. Because the SEC had a factual and legal basis for pursuing a claim against Bendelac, its position was substantially justified, and Bendelac is not entitled to attorneys' fees or expenses under the EAJA.

> **B.  Bendelac's Argument that the Commission Lacked Substantial Justification after Greyling's Deposition Testimony Is Meritless.**

Bendelac's primary argument justifying his application for fees and expenses is that Greyling made several statements during his deposition on September 4, 2024 that he claims undercut the Commission's case and its ability to claim substantial justification in going forward. *See* Dkt. 285 (Bendelac Memo) at 6-11. This argument relies on taking a few statements out of context and ignoring the evidence described above that supported the SEC's claims. In focusing only on Greyling's deposition rather than all the other evidence in the case, Bendelac ignores that the SEC had a basis for its claims and that Greyling did not contradict the evidence the SEC had gathered. Before Greyling was deposed, the Court denied Bendelac's and Capellini's motions for summary judgment and in denying Capellini's motion, which Bendelac joined, specifically stated "the court cannot say that, in weighing this course of events, a reasonable juror could not come to the conclusion that Bendelac was an active participant in the alleged fraudulent scheme and possessed the requisite intent." Docket Order,

August 29, 2023 (Dkt. No. 201). Nothing in Greyling's deposition eliminated the evidence that provided the basis for that finding.[7]

Initially, Greyling's statements that he does not remember instructing Bendelac either about the price of the stock to be traded or the purpose of the transaction does not provide evidence that such discussions did not occur as any conversation would have occurred many years before the deposition.

Next, Greyling's statements denying an intent to manipulate stock prices or defraud investors do not exonerate Bendelac. Greyling acknowledged during his trial testimony that trades in Token shares were "artificial and improper" (whether made by Greyling or Bendelac). Tr. Day 1 (Greyling) at 105:1-20. Further, when asked whether such trades by Bendelac (or himself) could have been made to "someone who was affiliated with Trends Investments somehow on the other side of the trade as well" (i.e., in a particularly manipulative manner), Greyling responded that it was not his understanding but "[i]t may have ended up that way." Greyling Dep. at 79:4-17.

Similarly, Bendelac's argument that Greyling's testimony undermines the Commission's allegation that Greyling and Bendelac manipulated the price of Token stock on February 19, 2019, when both purchased shares of Token is baseless. (Bendelac Memo at 8-9.) Bendelac cites Greyling's statement at his deposition that he had "no recollection of the trade and was not placing any manipulation with Roger that I was aware of in relation to this

---

[7] Courts have recognized that when the government's case prevails in the face of a summary judgment motion, there are strong objective indications that the case was substantially justified for the purposes of EAJA. *See, e.g.*, *First Interstate Bank v. Purewell Inv.*, 1995 U.S. Dist. LEXIS 16101 (N.D. Cal. Oct. 18, 1995), *aff'd*, 76 F.3d 386 (9th Cir. 1996) ("Although not dispositive, the survival of a motion for summary judgment is probative of the substantially justified standard."); *see also Jackson v. Bowen*, 807 F.2d 127, 130 (8th Cir. 1986) (stating that EAJA fees should not be awarded when "at least one permissible view of the evidence leads to the conclusion that the government has shown a reasonable basis in fact and law for its position.").

trade. I have no recollection of it." Greyling Dep. at 140:4-7. Greyling's lack of a clear recollection of the trade (or his own intentions) should end attempts to construe his response. In addition, the trading activity on this day itself appears to provide evidence of manipulation by Greyling, Rossetti, and Bendelac, all of whom purchased shares that day; indeed, Greyling exchanged seven calls with Bendelac on that day. PFF ¶¶218-228.

Similarly, Bendelac's argument that Greyling did not recall discussing whether the price of Token's stock was high enough is undermined by Bendelac's own admission at his deposition that he was aware that Greyling "was concerned with the price" of Token's stock. Bendelac Dep. 198:9-199:1. Greyling also affirmed that Brandon Rossetti was concerned that the price of the stock was too low ("He said I am working with an investor and they can see the price and he hummed and hawed about it") and that Rossetti attempted to address the issue by making trades in his personal brokerage account. Greyling Dep. at 101:17-102:19. In substance, Greyling knew that Rossetti was defrauding investors to sell shares *for Greyling*, even if Greyling somehow espoused the opinion that there was nothing wrong with that because "You can go buy shares in the open market in any company you want." *See id.* at 101:17-103:10.

In summary, none of Greyling's statements cited by Bendelac undermine either the factual or legal bases for the Commission's case against Bendelac. The Commission's case presented at trial was substantially justified.

### C. This Court's Favorable Assessment Regarding Bendelac's Credibility Does Not Demonstrate that the Commission's Case was Not Substantially Justified.

The fact that this Court found Bendelac credible does not demonstrate that the Commission acted unreasonably in pursuing its case against him.[8] Courts in similar cases

---

[8] The Commission does not challenge this Court's assessment. However, the Commission notes that several factors raised legitimate questions regarding Bendelac's

have denied EAJA fees notwithstanding the fact that they have made credibility determinations favoring a defendant and adverse to the Commission. In *United States v. Hurt*, 676 F.3d 649, 653 (8th Cir. 2012), the court noted that "[w]here a case involves primarily factual questions, this court has found that the government's position was substantially justified." The court explained:

> "Credibility is the quintessential factual question … For this reason, the Seventh Circuit concluded, 'when resolution of a case hinges to [a significant] extent on determinations of witness credibility, it is an abuse of discretion to find that the government's position was not substantially justified.'"

*Id*. (citations omitted); *see also Bricks, Inc. v. EPA*, 426 F.3d 918, 923–924 (7th Cir. 2005) (dismissing EAJA claim when underlying matter turned on agency's assessment of witnesses' credibility which was reasonable though ultimately rejected by court); *Jackson v. Bowen*, 807 F.2d 127, 130 (8th Cir. 1986) (stating that EAJA fees should not be awarded when "at least one permissible view of the evidence leads to the conclusion that the government has shown a reasonable basis in fact and law for its position.").

## II.     The Application Does Not Support a "Special Factor" Enhancement of Fees.

An award of fees and expenses pursuant to EAJA must be "based upon prevailing market rates for the kind and quality of the services furnished, except that ... attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). "This statutory ceiling is generally 'designed to hold down the government's costs by providing modest

---

credibility including the fact that he lied to Commission staff about his access to Capellini's trading account during his first interview (Court's Findings, pg. 3, fn. 4); his misuse of his brokerage account at First Manhattan to arrange "artificial and improper" stock sales; and his use of "a sham legal opinion" that "supported the deposit" of 300,000 shares of Token stock into his Aleutian account at First Manhattan (Court's Findings, ¶26).

11

compensation, with exceptions.'" *See Castenada-Castillo v. Holder*, 723 F.3d 48, 74 (1st Cir. 2013) (quoting *Atlantic Fish Spotters Ass'n v. Daley*, 205 F.3d 488, 491 (1st Cir. 2001)).

The Supreme Court has indicated that the "special factor" involving "limited availability of qualified attorneys for the proceeding" applies in a narrow range of cases:

> "[T]he exception for 'limited availability of qualified attorneys for the proceedings involved' must refer to attorneys 'qualified for the proceedings' in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or specialized skill *needful for the litigation in question*—as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation."

*Pierce*, 487 U.S. at 572 (emphasis added).

As the applicant, Bendelac "bears the burden of producing appropriate evidence" to support an award in excess of the statutory rate. *Doucette v. Comm'r of Soc. Sec.*, 13 F.4th 484, 488 (6th Cir. 2021). Bendelac has not demonstrated that this matter presented such complex legal issues that a similarly qualified attorney could not have provided representation at a lower rate than he seeks to recover in his application. *See Castenada-Castillo*, 723 F.3d at 75 ("the Supreme Court has determined that factors such as 'the novelty and difficulty of issues, the undesirability of the case [and] the work and the ability of counsel' do not, by themselves, merit awarding fees beyond the statutory cap" (citing *Pierce*, 487 U.S. at 573)).

Applicant's citation to *SEC v. Wilson*, 2009 U.S. Dist. LEXIS 66245 (D. Conn. Jul. 31, 2009) in support of his argument that special factors justify awarding enhanced fees to counsel is unpersuasive. The district court in *Wilson* determined that the case required an attorney qualified in a "specialized sense" possessing the "intimate knowledge of the inner workings of the securities broker-dealer industry" that Wilson's counsel had obtained over 25 years of practice in the securities field. *Id.* at *34. The court opined that counsel's "specialized expertise" was necessary to defend the fee applicant in that matter, and carefully detailed

12

counsel's broad experience in securities matters.[9] Finally, the district court also relied upon a declaration from a local attorney stating that there were "very few attorneys" in Fairfield County, Connecticut who possessed the specialized expertise needed to defend applicant in the matter, and that "none [of the few qualified attorneys in Fairfield County] would have taken this case and defended Mr. Wilson for a fee computed at the statutory rate" of $125. *Id*. at 34.[10]

By contrast, Bendelac's application provides no evidence that this matter raised complicated or novel issues that required him to retain counsel with the exceptional level of experience and expertise needed by Defendant's counsel in the *Wilson* case. Nor does the application argue that there is a shortage of qualified counsel in the Boston area to represent defendants in an action involving claims of securities fraud as was the case in *Wilson*. Finally, the application does not address the fact that the courts in this circuit routinely calculate fee awards under EAJA by adjusting the statutory rate according to a formula based on the annual average consumer price index for the Boston area. *See Castenada-Castillo*, 723 F.3d 48, 76–77; *Yong Tang v. Chertoff*, 689 F. Supp. 2d 206, 218–219 (D. Mass. 2010).

## CONCLUSION

For the reasons set forth above, Bendelac's motion seeking attorneys' fees and expenses should be denied.

---

[9] The district court noted that counsel's qualifications included, *inter alia*, a joint J.D./M.B.A. degree; service as an attorney with the SEC's Division of Enforcement "where he received specialized training in all aspects of the SEC's investigative and enforcement practices and procedures, as well as a securities broker-dealer practices and procedure;" and attendance at the New York Institute of Finance from 1980-1983 where he "received specialized training" in all aspects of the securities industry. *Id*. at *31–33.

[10] Wilson's counsel apparently practiced in Boca Raton, Florida.

Respectfully submitted:

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ David H. London
David M. Scheffler (Mass Bar No.670324)
Nita K. Klunder (Mass Bar No. 689304)
David H. London (Mass. Bar No. 638289)
Boston Regional Office
33 Arch St., 24th Floor, Boston, MA 02110
(617) 573-8997 (London direct)
londond@sec.gov


Timothy N. McGarey
 District of Columbia Bar # 420598
Securities and Exchange Commission
100 F Street, N.E.
Washington DC 20549
(202) 551-5179
McGareyT@sec.gov

Dated:  March 14, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2025, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

/s/     David H. London
